## A. C. HAMILTON ET ALS., RESPONDENTS, *v.* JOHN KNEE-LAND ET ALS., APPELLANTS.

A written agreement entered into by which, upon certain terms and conditions, the parties of the second part were permitted to erect a steam quartz mill on the premises of the party of the first part; and it is made the duty of the party of the second part to erect the mill within a certain time, and among other things to pump the water from the mine of the parties of the first part, gives the parties of the second part an estate upon condition in the premises.

No precise words are required to create a condition. The intention of the parties, which is to be gathered from the whole instrument and the subject matter to which it relates, must determine the question.

The common law rule, that a condition cannot be reserved to any but ·the grantor and his heirs, has not been recognized as the law in this country.

Under the Organic Act and laws of the Territory of Nevada no appeal could be taken from an order made by a referee.

The common law of England, as adopted in this country, is usually to be taken as modified by English statutes passed prior to the declaration of American Independence.

The statute of 32, Henry VIII., providing for entering, upon condition broken, is applicable not only to breach of condition in law but also in deed.

Upon a breach of a condition upon which an estate is held, an actual entry is not necessary to defeat the estate; a demand of possession is sufficient.

APPEAL from the District Court of the First Judicial District of Nevada Territory, Storey County, Hon. J. W. NORTH presiding.

With exception of the following agreement the facts of this case sufficiently appear in the opinion of the Court.

This agreement, made and entered into this ninth day of November, A. D. one thousand eight hundred and sixty-one, by and between A. C. Hamilton and Edwin R. Burke, parties of the first part, and Robert A. McLellan, party of the second part, all of Gold Hill, Carson County, Nevada Territory.

Witnesseth, that whereas, the said Hamilton and Burke are the owners of the mining ground and claims of forty feet in width, part of the so-called "Sabins ground," in said Gold Hill, and being bounded on the northerly side by the mining ground of W. H. Irwin, and on the southerly side by the mining ground of Stewart, Kirkpatrick and Churchill; and whereas, said parties have agreed that the said party of the second part may erect a steam quartz mill of sixteen stamps on said mining

ground, for the working and reducing of five thousand (5,000) tons of ore, to be taken from said mining claims and ground, on certain terms and conditions.

Now, therefore, for the purpose of carrying out the agreement and undertaking as aforesaid, the parties hereto agree as follows:

*First*—That the said McLellan shall, within one hundred days herefrom, erect and put in good workmanlike order and condition, on said mining ground at his own proper cost and charge, a steam quartz mill with sixteen stamps, to be worked with wet batteries and twenty (20) Brevoort's amalgamating pans, and such process as the said parties of the first part may designate and require, with all necessary and suitable machinery, fixtures and appurtenances.

*Second*—That the said party of the second part shall furnish the motive power at the mill, and machinery to hoist the ore from said mine as aforesaid, and shall also furnish the pumps and necessary machinery, and pump from the said mine the water, so as to keep the same constantly freed of water so that the said mining ground and claims can be safely and conveniently worked. The motive power, and operating the same for hoisting the ore from the mine, shall extend to all the ores, earths and rocks which the said parties of the first part, or assigns, shall mine in said claims and ground of forty feet, during the period in which the said party of the second part shall be so engaged in working and reducing the aforementioned five thousand tons of ores; and the mine as aforesaid, shall be kept freed from water as aforesaid to the depth of two hundred and fifty feet from the top of the shaft hereinafter mentioned, if the said parties of the first part, or their assigns, shall, during the period of working such five thousand tons, sink their shaft to that depth.

*Third*—The said party of the second part, agrees to work and reduce five thousand tons of gold and silver ores, rock and earths from said mining claim of the parties of the first part, with such reasonable and proper expedition as will save and secure the precious metals contained therein, and shall work the same in a manner to give satisfaction to the said parties of the first part, or their assigns, or such persons as they may

place in said mill (if they should elect to do so) to superintend the crushing and working of said ores, rock and earths; and the said party of the second part is to use such process or processes as the said parties of the first part, or their assigns, may designate and require. Provided, that if chemicals are used or required by any such process of working or reducing, the same shall be supplied at the cost and expense of the said parties of the first part, or their assigns, except quicksilver, which shall be at the expense of the party of the second part.

*Fourth*—The said party of the second part agrees to work continuously to the full capacity of the mill, which he may erect at said place, until the full and entire completion of the working and reducing of the said five thousand tons of ores and earths as aforesaid as may be mined in said claim and required to be worked by the said parties of the first part, or their assigns.

*Fifth*—The returns from the said working and reducing of ores as aforesaid, shall be made in the bullion derived therefrom, to the said parties of the first part, or their assigns, as often as and when cleaned up from the batteries and amalgamators, and the cleaning up to be as frequent as customary and usual in quartz mills of similar character in this Territory.

*Sixth*—The ores, earths and rock, as hereinbefore specified, shall be taken by the party of the second part at the mouth of the shaft as hereinafter specified, and he shall also supply the motive power, and operating the same for hoisting the ores, earths and rock as aforesaid; and the parties of the first part, or their assigns, shall have the right of way at said mine and mill to remove all such surplus of ores, rock and earths, and all debris, which may be taken from said mine. The screens used on the batteries for the discharge of pulp, shall be of a fineness equal to any quartz mill working by the wet process of crushing now in this Territory, or which may hereafter be adopted by any such mill. The said parties of the first part, or their assigns, shall be entitled to all the tailings which may be derived from the working of such five thousand tons of ore, earth and rock, and the said parties of the second part shall

provide the means and pay the expense of weighing such five thousand tons of rock.

*Seventh*—In consideration of the working and reducing such five thousand tons of rock, ores and earths as aforesaid, and the supply of such motive power and hoisting the rock, ores and earths from said mine, and freeing said mine of the water which may be found therein, and the delivery of the bullion as aforesaid, the said parties of the first part agree on their part, and their assigns, heirs, executors and administrators, that they will sink a shaft on such mining ground and claims, and mine the rock, ores and earths, and supply all necessary and needful buckets, ropes and other implements of hoisting and raising rock to the top of such shaft, and furnish the necessary labor in raising and hoisting all such rock, ores and earths taken from said mine (except the labor in operating the motive power) and supply the said mill to be erected by the party of the second part, with such ores, earths and rock sufficient to keep the same continuously employed to the extent and measure of five thousand tons as aforesaid; and upon the delivery of the bullion of each lot or parcel thereof, to pay the said party of the second part the sum of twenty (20) dollars per ton of twenty hundred pounds weight, of all such rock, ores and earths as may be worked and reduced as aforesaid, by said party of the second part. Provided, that if any unavoidable accident or cause should occur by which either of the parties of the first or second part shall be prevented from the working of the said mill or mine, then the said party of such part shall not be liable for damages to the said party of the other part.

*Eighth*—Upon the full completion and fulfillment of this contract and agreement, by the working of said five thousand tons of ores, earths and rock as herein provided—if the said parties of the first and second part, or their assigns, cannot agree upon a further contract of working and reducing ores and earths as aforesaid, or for the sale or other disposal of said mill, machinery and fixtures to be erected by the said party of the second part—then and in that event the said party of the second part, his heirs or assigns, shall have the right and privilege of removing within forty-five days from the completion

of such contract of working the rock, ores and earths as aforesaid, said mill, machinery and fixtures, and pumping apparatus so to be erected by him, the said party of the second part. Provided, that if the amalgamating pans to be used in said mill shall be required by the parties of the first part to be changed, then and in that event the same shall be furnished and placed in said mill at the expense of said parties of the first part, provided that no damages shall be charged by reason of detention in making such change; and it is furthermore agreed that all the water raised from said mine shall belong to the party of the second part.

The meaning intended and conveyed in article third of this agreement by the words that the party of the second part shall work the ores, etc., of the mine to the satisfaction of the party of the first part, shall not be so construed as to demand of the party of the second part to do more than is or may be practically done in mills crushing and amalgamating ores in a similar manner in this Territory.

In witness whereof, the parties hereto have on the day and year first above mentioned, hereunto set their hands and seals in duplicate.

Signed by ROBERT A. McLELLAN,
A. C. HAMILTON,
EDWIN R. BURKE.

Witnessed by JAMES D. JACKSON,
JAMES McGINNESS,
R. V. DEY.

*Crittenden & Sunderland* and *Tod Robinson*, Attorneys for Appellants, made the following points:

The contract between Burke & Hamilton on the one part, and Robert McLellan on the other part, created a freehold estate in McLellan. (9 Johnson, 298; 2 Bouvier's Dictionary, p. 49 and cases cited; 5 Barnwell & Cresswell, 221, 232-3.)

Recitals may operate as direct words of grant. (1 Bingham, 433.) We shall refer also to 2 Parsons on Contracts, 436, 440; 2 American Leading Cases, 680, 700.

The deed or grant contained limitations on the freehold and

mutual covenants on the part of both grantor and grantees, but no conditions, for no Court will ever construe a grant as conditional where it is capable of any other reasonable con-. struction. The law abhors forfeitures, (2 Bacon's Abridgment, 287.)

If the instrument does not convey an estate, it at least amounts to a license coupled with an interest, and is irrevocable by the licenser, capable of sale by deed, and being created by deed can only be divested in the same way, unless it expires by its own limitation: (2 Bouvier's Dictionary, 4, 5, and cases there cited; 7 Bingham, 682, 694; 3 Bingham, 115; 11 Adolphus & Ellis, 3, 4.)

The covenant (or condition, if it be one) as to the time within which the mill was to be completed was waived, and once waived no forfeiture thereafter, on that account, could be claimed or enforced. (3 Bacon's Abridgment, 316.)

In all other respects, except as to the time within which the mill was to be completed, the first and only violation of the contract was on the part of the plaintiff, in failing to deliver ore as per agreement, whilst the shaft was being sunk to the depth of two hundred and fifty feet.

There can be no forfeiture in favor of a stranger. (Coke upon Lyttleton, pp. 2140, 2146, sec. 347; 2156, sec. 348.)

The Court below erred in not granting a new trial, for the reasons assigned in the statement for new trial.

*Kirkpatrick & Rhodes* and *G. A. Nourse*, for Respondents.

### I.

The agreements under which appellants claim gives them no title to, nor estate in, the demanded premises; it merely amounts to a license to McLellan, under whom they claim to build a quartz mill on Burke and Hamilton's ground, and to remove the same upon the full completion and fulfillment of said agreement. Without such full completion and fulfillment, McLellan and his grantees could acquire no right under said agreement, even to remove the mill erected thereunder.

1. The interest acquired by McLellan was not a fee. (2 Bl. Com. 104.)

2. Nor an estate for life, nor for years. (4 Kent's Com. 85; 2 Bl. Com. 120, 140, 143, 318 and note; Taylor's Land. and Ten. p. 9, secs. 14, 15; 1 Wash. Real Prop. secs. 2, 3, 4, p. 291.)

3. Nor is the agreement "a grant," as insisted by the intervenor. (3 Jacobs' Law Dict. 193, "Grant;" 4 Kent's Com. 490, 495; 2 Bl. Com. 317; 4 East. 469.)

4. Nor did McLellan acquire an easement by virtue of said agreement, there being no *dominant* tenement. (4 Sand. Ch. 89, *Wolfe* v. *Frost;* 7 Barb. 74, *Doolittle* v. *Eddy;* 14 Penn. 286, *Cullen* v. *Hilty;* 17 Conn. 402, *Branch* v. *Doane;* 3 Kent's Com. 454.)

5. He did obtain in said agreement a *license* to go on and build a quartz mill on demanded premises, subject to the conditions therein specified.

## II.

Having obtained this license upon the conditions specified in the agreement, it was forfeited by nonperformance of the same.

1. He did not erect the mill as agreed within the one hundred days specified.

2. He did not furnish the motive power stipulated by the second clause of the agreement, nor the pumps and necessary machinery, nor did he pump the water from the mine as agreed. (See 11th finding of referee.)

4. Said license being executory, was revocable. (4 Johns. 418, *Jackson ex dem Hall* v. *Babcock;* 11 Mass. 533, *Cook* y. *Stearns;* 3 Duer, 255, *Jamieson* v. *Milman;* 13 M. & W. 238, *Wood* v. *Leadbetter;* 4 East. 108; 23 Conn. 223; 1 Wash. on Real Prop. 400, sec. 10, sec. 13, note.)

5. Said license being conditional, was revoked by breach of the condition. (15 Wend. 385, *Mumford* v. *Whitney;* 4 Johns. 418, *Jackson* v. *Babcock.*)

6. Said license was expressly revoked before suit brought. (See 14th finding of referee.)

## III.

The appellants cannot claim under the agreement in question, as shown ante, said agreement was a mere license to Mc-

Lellan, party of the second part, and such license is unassignable. (Wash. on Real Prop. 399, sec. 9; 15 Wend. 392, *Mumford* v. *Whitney;* 37 Eng. C. L. and Eq. 489, *Coleman* v. *Foster;* 10 Conn. 382, *Prince* v. *Case;* 13 Johns. 312, *Vanderburgh* v. *Van Bergen;* 2 B. & Ad. 303, *Robson* v. *Drummond;* 3. Cal. 348, *Fitch* v. *Brockman.*)

## IV.

Even had the agreement under which appellants claim conveyed to their grantor, McLellan, an estate in the demanded premises, such estate would confessedly be upon condition subsequent. The failure before shown of performance of the condition would forfeit such estate. (4 Kent's Com. 105, 123, and authorities cited; 5 Ham. (Ohio) Rep. 389, *Lessee of Sperry* v *Pond;* Coke Litt. 251, B. p. 203, sec. 328, orig. edition; 8 Pick. 287, *Gray* v. *Blanchard;* 2 Parsons on Contract, 36, 39.)

## V.

Ejectment lies whenever a vendee or his assigns fails to comply with his contract, even though he had been let into possession. (7 Cowen, 747, *Jackson ex dem Church* v. *Miller;* 5 Wend. 29, *Jackson* v. *Moncrief;* 15 Cal. 334, *Palmer* v. *McCafferty;* 10 Cal. 538, *Beem* v. *McCusick.*)

## VI.

Nor are the respondents barred from enforcing the forfeiture aforesaid, by reason of their not being original parties to the agreement in question.

The rule that none but the grantor can enforce a forfeiture was never the rule in this country; for

2. The common law rule was changed by the Statute 32, Henry VIII., c. 34, long prior to the Revolution, under which statute grantees of reversions and privies in estate are enabled to take advantage of the breach of conditions. (2 Cruise Dig. p. 4, sec. 16; 1 Kent's Com. 473.)

*Crittenden & Sunderland* and *Tod Robinson* in reply.

Appellants claim that by force of the agreement and the erection of the mill, they have an estate in the land which can-

not be divested until the stipulated amount of rock is crushed, and if for any default of theirs this is not done the remedy of respondents is not by ejectment, but for a recision of the agreement and by action for damages, or a proceeding to compel a specific performance.

A license by deed becomes a grant under certain circumstances. (2 Parsons on Contracts, 23, and notes.)

A license to erect expensive improvements on another's land, when they are erected, is not revokable. (1 American Leading Cases, 682, and notes to *Rerick* v. *Kern* therein reported, particularly pp. 689, 695, 696 and 698.)

Respondents further contend that if the license or interest created by the agreement and the building of the mill created an interest or an estate in the land, this interest has been forfeited by the nonperformance of condition.

Waiving, for the present, the inquiry whether the stipulations of the parties as to the special default charged are conditions or covenants, we answer that the plaintiffs are not the parties who can claim the benefit of the forfeiture.

Because a condition cannot-be reserved to any but the grantor and his heirs. (2 Coke's Lyttleton, pp. 214, 215 ; 4 Kent's Com. 122, 123 ; 2 Washburne, 318.)

It is, however, urged by respondents that the provisions of the common law herein invoked has been changed by the statute of Henry VIII., and that that statute is a part of the common law as expounded in the United States.

Appellants deny that the statutes of England are in force here in any manner except re-enacted or adopted by legislative action. Without discussing this any further than to enter our protest against this assertion, we assert that by the statute of Henry, forfeitures are made assignable only in cases of *breach of condition by law*. (4 Kent's Com. 123 ; 2 Coke, 215 ; Smith's Landlord and Tenant, 362.)

Secondly, we answer to this that before any party can take advantage of a breach of condition to work a forfeiture, he must *first enter on the estate*. (4 Kent's Com. 127 ; 1 Washburne Real Property, 322, sec. 12.)

Opinion by Lewis, C. J., Brosnan concurring.

This is an action of ejectment brought to recover possession of a mining claim located in Gold Hill, in the County of Storey. The complaint is in the usual form, alleging title in the plaintiffs, and ouster and wrongful holding by defendants. The defendants, Kneeland and Requa, answer jointly, admitting the title of Burke and Hamilton, but denying that they are entitled to the possession of the premises, or that they have any interest in the mill, machinery, pumps, fixtures, or other improvements connected with the same; also denying the ouster and wrongful withholding of the premises by them; and claiming the right of possession in themselves under and by virtue of a certain agreement which is made a part of their answer.

They allege that they have performed all the requirements of the agreement on their part, and aver their willingness to crush the five thousand tons of rock mentioned therein, when the same shall be furnished to them by the plaintiffs.

The case was referred to a referee to report facts and a judgment, and the following facts and conclusions of law were reported:

*First*—The ground in controversy is the property of the plaintiffs.

*Second*—On the 9th day of November, 1861, and at the time of making the contract hereinafter stated, said ground was the property of the plaintiffs A. C. Hamilton and E. R. Burke.

*Third*—Plaintiffs John Drynell, Charles W. Newman, and Samuel Doake, purchased interests in said grounds subsequently to the 9th day of November, 1861.

*Fourth*—On the 9th day of November, 1861, plaintiffs Hamilton and Burke and Robert A. McLellan, made and entered into an agreement in writing, a copy of which is made a part of the answer of defendants.

*Fifth*—On the 25th day of November, 1861, said Robert A. McLellan transferred and assigned to defendant Isaac L. Requa, one-fourth interest in said agreement, and conveyed a like interest in the quartz mill and machinery in said premises; and on the 6th day of October, 1862, said McLellan conveyed an undi-

4

vided three-fourths of said mill and machinery to defendant John Kneeland.

*Sixth*—On the 5th day of February, 1864, said John Knee-land leased three-fourths, undivided, of said mill and machinery to Robert Carson; and on the 1st day of March, 1864, said Carson transferred and assigned said lease to intervenor, E. B. Kenyon.

*Seventh*—Said E. B. Kenyon holds a mortgage and debt against defendant (Kneeland), as set out in the intervention herein.

*Eighth*—Said Carson and Kenyon went into possession of Kneeland's interest after the bringing of this suit, and with full knowledge of its pendency.

*Ninth*—The mill referred to in said contract between Hamilton and Burke and McLellan, was commenced in December, 1861, and completed in the latter part of October, 1862.

*Tenth*—The shaft mentioned in said agreement, was sunk to the depth of two hundred and fifty-seven and seven-twelfths feet from the surface of the ground after the ground was graded, and a drift run easterly from said shaft about one hundred and twenty-five feet, crossing a ledge of pay rock about ten feet wide, and running about twenty-five feet beyond the ledge. The bottom of said drift was two hundred and forty-six feet below said surface. This work was done about a month before the mill was completed.

*Eleventh*—The pumping mentioned in said agreement started when the shaft was at the depth of one hundred and fifty feet, and ceased directly after the completion of the drift. At that time it was agreed by Burke and McLellan that the pumping might cease until the mill should be finished. There was no understanding that the pumping should stop altogether. It was impossible to work the ledge without pumping to keep the mine free from water, and for this purpose steam machinery was necessary. Kneeland went into possession of the mill with Requa about the 1st of December, 1862. There was then about twenty-five feet of water in the shaft, and enough in the drift to prevent work. In that month and in the following January, February, and March, plaintiffs demanded that defendants should pump out the shaft, so that the ledge might be

worked, but defendants positively refused. They were after-
wards frequently requested to go and pump, but never did so.

*Twelfth*—Plaintiffs offered to furnish ore if defendants would
pump out the mine. If the mine had been pumped out there
could have been more than sufficient ore taken from it to sup-
ply the mill constantly to the extent of five thousand tons.

*Thirteenth*—Notice *lis pendens* was duly filed in the office
of the County Recorder of Storey County, on the 24th day of
December, 1863.

*Fourteenth*—Plaintiffs demanded possession of the ground
in controversy on the 28th day of December, 1863.

I find, as conclusions of law, from the foregoing facts, that
by reason of the non-performance of the contract between
Burke and Hamilton and McLellan, on the part of McLellan
and these defendants—his assignees—said defendants had,
before the commencement of this action, lost the right of pos-
session of the disputed premises, and that the plaintiffs are
entitled to the relief prayed for in their complaint.

A motion for new trial having been made and denied, the
defendants appeal, assigning numerous errors, only four of
which are relied upon in this Court, which are :

*First*—That the referee erred in holding that a refusal on
the part of the defendants to pump out the mine at the time,
and under the circumstances, was a violation of the written
agreement between Burke and Hamilton and McLellan.

*Second*—In holding that such violation of the contract
worked a forfeiture.

*Third*—In holding that the terms of the contract were con-
ditions and not covenants.

*Fourth*—In holding that the assignees could claim a forfeit-
ure of defendants' rights under the contract upon breach of
condition.

If the agreement between Burke and Hamilton and McLel-
lan is uncertain as to when the pumping by McLellan should
commence, the intention of the parties to it, which is of con-
trolling force when ascertained, should govern. (2 Par-
sons on Contracts, 6 ; Id. 11.) The conduct of the parties,
the object which they had in view in entering into the agree-
ment, and the manner in which they carried out this provision

of it, establishes the fact beyond a peradventure that the pumping was to be done by defendants at the time the shaft was being sunk, if necessary. And, indeed, it appears that no misunderstanding upon this point arose between the parties until the shaft had been sunk to its required depth, the ledge struck, and plaintiffs were ready to take out the ore.

But should the defendants' interpretation of this agreement be adopted, that is, that it was not their duty under it to pump the water from a prospecting shaft but only from the mine, it is equally fatal to their case, because it was the *mine* which they refused to pump, and that too when the plaintiffs were fully prepared to take out the ore.

Whatever difference of opinion there may exist as to the duty of the defendants to pump the water from the shaft, none can exist as to their duty to keep the *mine* free from water. The instrument itself is explicit upon the point. It provides: "That the said party of the second part shall furnish the motive power at the mill, and machinery to hoist the ore from the said mine as aforesaid, and shall also furnish the pump and necessary machinery, *and pump from the said mine the water, so as to keep the same constantly freed of water, so that the said mining ground and claims can be safely and conveniently worked.*"

This was not done; but it seems the defendants persistently refused to pump out the mine after the ledge was struck in the lower drift. And the referee finds that "it was impossible to work the ledge without pumping to keep the mine free from water." By this refusal on the part of the defendants to perform their agreement in this particular, the very object for which the agreement was entered into by plaintiffs, that is, the development of their mine, was entirely defeated.

When the pumping was stopped for the benefit of McLellan, as it appears, and the mine in consequence thereof filled with water so that it could not be worked, for him and his assignees persistently refused to pump it, because, as it is claimed by them, it is not their duty to pump the mine until rock is furnished to them, is an exhibition of bad faith, to say the least of it, which should receive no favor in a Court of Justice.

But did the violation of the agreement by the defendants

work a forfeiture of their rights or the estate which they acquired under it? If the estate which the defendants acquired in the premises was upon condition, the breach of the condition will work a forfeiture of the estate; but if the stipulations of the agreement are to be construed as covenants and not conditions, then the plaintiffs have mistaken their remedy, and they must fail. After the erection of the mill upon the premises by McLellan, it is clear that he had an interest in the land, and I think it equally clear that that interest was an estate upon conditions.

Chancellor Kent, vol. 4, p. 125, says: "Estates upon condition are such as have a qualification annexed to them by which they may, upon the happening of a particular event, be created or enlarged, or *defeated*." After speaking of conditions in law, he says of conditions in deed: "These conditions are expressly mentioned in the contract between the parties, and the object of them is either to avoid or defeat an estate, as if a man, to use the case put by Littleton, enfeoffs another in fee, reserving to himself and his heirs a yearly rent, with an express condition annexed, that if the rent is unpaid the feoffer and his heirs may enter and hold the land free of the feoffment. So if a grant be to A in fee, with a proviso, that if he did not pay twenty pounds by such a day, the estate should be void, and the grantor or his heirs may enter and take advantage of the breach by ejectment, though there be no clause of entry." Id. 127.

Conditions which will work a forfeiture of an estate, it is true, are not favored, and will not be readily implied; but the estate created in McLellan is so unmistakably upon condition, that we could not hold otherwise without disregarding the plain letter of the agreement and the evident intention of the parties. This agreement provides: "That, whereas, the said Hamilton and Burke are the owners of the mining ground and claims of forty feet in width, part of the so-called 'Sabins ground,' in said Gold Hill, and being bounded on the northerly side by the mining ground of W. H. Irwin, and on the southerly side by the mining ground of Stewart, Kirkpatrick, and Churchill; and, whereas, said parties have agreed that said party of the second part may erect a steam quartz mill of sixteen stamps on said

mining ground, for the working and reducing of five thousand tons of ore, to be taken from said mining claims and ground, on *certain terms and conditions.*"

The only rational and grammatical construction which can be put upon this language, is that McLellan was to have the privilege of erecting a steam quartz mill on the plaintiffs' premises, upon "the terms and conditions" which are specifically mentioned in the agreement itself, one of which was that he would "pump from the said mine the water, so as to keep the same constantly freed from water, so that the said mining ground and claims can be safely and conveniently worked."

Again, no precise words are required to create a condition. (2 Parsons on Contracts, 39.)

"Indeed," says the same author, "Courts seem to agree of late that the decision must always depend upon the intention of the parties, to be collected in each particular case from the terms of the agreement itself, and from the subject matter to which it relates. It cannot depend upon any formal arrangement of the words, but on the reason and sense of the thing, as it is to be collected from the whole contract." But here we have the exact words to create a condition. (*Gray* v. *Blanchard*, 8 Pick. 283.)

And the evident intention of the parties, as shadowed forth in the entire instrument, harmonizes with these words.

Unless we believe that Burke and Hamilton intended to permit the erection of the mill in question on their premises, and to permit its continuance there, regardless of whether McLellan should perform his part of the agreement or not, the conclusion is irresistible that they only intended to permit it upon the conditions mentioned in the instrument itself. That would be the only advantage which they could possibly derive from the location of the mill upon their premises, and it is not reasonable to suppose that they intended to permit the defendants to enjoy the premises except upon the performance of their part of the contract.

It is urged, though, by the defendants, that a breach of conditions cannot be taken advantage of by a stranger. But Burke and Hamilton themselves are claiming this forfeiture, and the fact of their having conveyed a certain interest in the

Hamilton *et als. v.* Kneeland *et als.*

premises to strangers, who are joined with them as plaintiffs, surely should not deprive them of the right of taking advantage of the breach of conditions.

But this rule of the common law, that a condition cannot be reserved to any but the grantor and his heirs, I think has never been recognized as the law in this country, and it was completely overturned in England by the statute 32, Henry VIII., C. 34, which permitted grantees of reversions and privies in estate to take advantage of the breach of condition (4 Kent's Commentaries, 126 ; 2 Cruise Digest, p. 4, sec. 16) ; and in adopting the common law of England in this country, it seems to be the established doctrine that it is adopted as amended or altered by English statutes in force at the time of the emigration of our colonial ancestors. (1 Kent, 473 ; *Sackett* v. *Sackett,* 8 Pickering, 309 ; *Patterson* v. *Winn,* 5 Peters, U. S. Rep. 233.) With this view of what constitutes the common law of this country, I am of opinion that the grantees of Burke and Hamilton could take advantage of the breach of condition by the defendants.

For these reasons we think the judgment below should be affirmed.

[Justice BEATTY having been engaged as counsel below, did not sit.]


Opinion by BROSNAN, J., LEWIS, C. J., concurring.

The petition for a rehearing in this case, presents a point now raised for the first time. It is urged that, by the Organic Act of the Territory of Nevada, all judicial power was vested in certain Courts therein designated ; that the motion for new trial was not acted upon by any tribunal specified in the Act ; that the order of Mr. Whitman, the referee, was not a judicial act, and as this Court can only exercise judicial power of an appellate character, that action in this case is beyond the scope of its power, that it cannot entertain appeals from the decisions of private individuals.

We recognize the principle that consent of parties cannot confer jurisdiction, as we do that which holds that a person cannot take advantage of his own wrong.

Final judgment was entered in the proper District Court on the report of the referee, Mr. Taylor, on the 9th day of May, 1864.

By stipulation of parties a motion for new trial was made by appellants before Mr. W., and an order denying the motion was entered on the 11th day of July, 1864. On the following day the appellants gave notice of appeal to the Supreme Court of the Territory, and filed the usual bond. Thus it appears that at the time of the organization of our State, the action was pending in the Court of which this Court is successor; and by the provisions of the Constitution, that appeal was transferred to this Court upon the transition from a Territorial to a State Government.

*Vide* Art. XVII., Sec. 4, of the Constitution of Nevada. We think this point has no merit.

In our former opinion it is stated that in adopting the common law of England in this country, it seems established doctrine, that it was adopted as amended or altered by English statutes in force at the time of the emigration of our colonial ancestors. Counsel thinks this is erroneous, and asks that it be reconsidered. We have done so carefully, and find no reason for a change of opinion.

Chancellor Kent, after saying that the common law of England, so far as it is applicable to our situation and Government, has been adopted as an entire system in several of the old States, adds: "It has been assumed by the Courts of Justice or declared by statute, with the like modifications, as the law of the land in every State. It is also the established doctrine that English statutes, passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country." (1 Kent's Com. 473.)

Judge Storey (in 5 Peters, 241) says: "Those statutes, (English) passed before the emigration of our ancestors, being applicable to our situation, and in amendment of the law, constitute a part of our common law.

Bishop says: "A large proportion of the older English statutes are common law here, as by and by will be explained." (Bishop's Cr. Law, Sec. 10), and further adds (Sec. 11), "but

general statutes, amendatory therefore of the common law, came, and they constitute a part of the common law.

Sedgwick, in his work on Common Law, after a full review of authorities, writes: "The great body of the Common Law of England, and of the statutes of that country as they existed in 1776, are then, so far as applicable to our condition, the basis of our jurisprudence." (Sedgwick on Stat. and Const. Law, 18.) But counsel reply that this doctrine embraces only the original States. In the words of the petition: "The thirteen original States of the Union were English Colonies, peopled by Englishmen, and consequently come within the rule em-. braced by the Court." The authorities recognize no such limitation, and upon principle there ought to be none. When the Common Law of England, consisting in part of statutes, as we have shown, has been adopted in the United States, why may not Americans, like the adventurous emigrants of other nationalities, carry with them the common law of their country into the Territories acquired since the Revolution?

And whenever that law, without exception, is declared, as it has been here, to be the rule of decision, why shall it not prevail? In *Norris* v. *Harris* (15 Cal. 258), Chief Justice Field, after stating that the Common Law of England was repeatedly presumed to exist in the original States, and in those carved out of them, adds: "A similar presumption must prevail as to the existence of the common law in those States which have been established in Territories acquired since the Revolution, where such Territory was not, at the time of its acquisition, occupied as an organized and civilized community, when in fact the population of the new State upon the establishment of Government,. was formed of the emigration from the original States." This language possesses peculiar force in this State. Again, counsel say that the statute (32, Henry, VIII.) is confined to the assignability of breaches of conditions in law, as contra-distinguished from conditions in deed. We have sought in vain for authorities to satisfy ourselves of this distinction. Certainly, the language of the statute does not make any. It is most general and comprehensive in its terms, was enacted to remove restraint of feudal law, and should not in this age be circumscribed in its opera-

tion. It has been acknowledged and pronounced to be a wise and just enactment.· It reads : " All persons and bodies politic, their heirs, successors and assigns, etc., and also all other persons being grantees or assignees to the King, or to any other person or persons, and the heirs, executors, successors and assigns of every one of them, shall have the like advantage by entry, for non-payment of rent, for doing waste, or any forfeiture, etc."

Lord Coke, in commenting upon this statute, states his opinion of it as follows :

*First*—That the statute is general, viz : That the grantee of the reversion of every common person, as well as of the King, shall take advantage of conditions.

*Second*—That this statute extends to grants made by the successors of the King, although the King only be named in the act.

*Third*—That where the statute speaks of grantees and assignees of the reversion, an assignee of a part of the estate of the revision, may take advantage of the condition. (Vid. 1, Cruise, title 13, ch. 2, secs. 55, 56.)

Chancellor Kent says in relation to it : " The statute has been formerly re-enacted in some of the United States, and though the statute was made for the special purpose of relieving the King and his grantees, etc., yet the provision is so reasonable and just that it has doubtless been generally assumed and adopted as part of our American law." (1 Kent, 127.)

It is however claimed, that notwithstanding a breach of condition, the estate can only be defeated by entry. This is ·stereotyped through the books but often misapplied. An entry was not necessary upon a breach, except where the condition was annexed to a freehold estate. In such case there must be an entry or claim, for the purpose of determining the estate. But upon a breach of condition annexed to an estate for years, the estate *ipso facto* ceased the instant the condition was broken. (4 Kent, 133; 1 Cruise, tit. 13, ch. 2, secs. 42–45.) The estate claimed in this case was of a lower grade than an estate of freehold. The reason why an entry was requisite is, that as seizen passed by livery, the estate could revert only by an act of equal notoriety. The reason of the

rule does not exist with us; and the reason ceasing, the rule itself ceases.  *Cessante ratione, cessat, ipsa lax.*

But the members of the profession understand that the refinements and subtleties that marred and disfigured the law relating to real estate in England, have been dispelled by the experience and enlightenment of our day.  At most, only a demand of possession before suit is necessary with us.  That .is the equivalent of an entry, and it was seasonably made in this instance.

Our attention has been particularly directed to a case in 12 Barb. 144, which is claimed to be an authority very much in favor of the appellants.  The facts in that are very dissimilar to the facts in this case.  In that, the plaintiff executed and delivered a deed of a strip of land in fee simple to a railroad company, conditioned that defendants should make and maintain fences, and complete the railroad by the first of January, 1843, in failure of which the deed should be void.  The defendants did not finish the road until September, 1844. The plaintiff took no steps to enter for the breach of condition, nor did he assert his right to the possession in any manner, nor give any notice to the defendants until September, 1846 (nearly four years after the forfeiture), at which time he gave notice to quit.  Suit was commenced in October, 1846. After the forfeiture, and a year before suit was brought, the plaintiff notified the defendant to put up the fences along the roadsides, which they did.  He also used the road himself and rode in the cars long after the forfeiture, and without complaint or intimation of the breach of covenant to defendants, except as above stated.

The road cost twenty thousand dollars per mile in its construction, and would be useless if the plaintiff should succeed in his suit, which was ejectment.  It was held that he waived forfeiture, and could not recover the land; very properly, we think. In that case, so conclusive was the evidence of a waiver of the forfeiture, that any Court must wink very hard not to see it.

The Court use this language:  "No stronger evidence could be exhibited—short of the execution and delivery of a new deed—of a design to waive a forfeiture, and confirm the grant, than the facts to which I have adverted."

Aside from any other consideration, if we should conclude that there had been a waiver of the forfeiture to put up the mill within the prescribed time, there was still the continuing condition in the agreement before the Court, to keep the mine free from water; failing to do which, a breach of the condition daily recurred. To compare the case in Barber with the one before the Court, would be to confound things.

If we entertained any doubt, however, as to the correctness of our conclusions, we would gladly grant a re-hearing in this case; but we do not.

In conclusion: The petition states that our former decision rather strains a point to establish a forfeiture. The learned counsel who prepared it, we presume, does not expect any response to that most pregnant part of his argument.

A re-hearing is denied.