T. J. ROBERTSON v. THE STATE.

No. 870.  Decided October 11, 1911.

Rehearing denied January 10, 1912.

**1.—Murder—Evidence—Defendant as a Witness.**

The testimony of a defendant at a former trial can be introduced in evidence against him on a subsequent trial. Following Preston v. State, 41 Texas Crim. Rep., 300, and other cases.

**2.—Same—Evidence—Reproduction of Testimony.**

The testimony of a witness on a former trial can be reproduced against the defendant on a subsequent trial, when the witness has since the first trial died or gone beyond the jurisdiction of the court. Overruling Kemper v. State, 63 Texas Crim. Rep., 1; Cline v. State, 36 Texas Crim. Rep., 320. Following Porch v. State, 51 Texas Crim. Rep., 8. Davidson, Presiding Judge, dissenting.

**3.—Same—Constitutional Law—Bill of Rights.**

The provision that the accused shall be confronted by the witnesses against him, as contained in Bill of Rights, Sec. 10, Constitution of 1876, was the same in every Constitution since and including that of the Constitution of the Republic of Texas in 1836; and a similar provision is contained in the Constitution of the United States, and most of the States of the Union, under practically all of which it has been held that such testimony is admissible in evidence, when the witness has died or gone beyond the jurisdiction of the court since he testified on a former trial.

**4.—Same—Judicial Construction.**

It is recognized by all the courts that this provision was a part and parcel of the English law at the time of the revolt of the colonies and the establishment of this Union, and Texas in adopting this clause but reiterated what was the law in the colonies prior to their independence.

**5.—Same—Decisions of Other Countries and States.**

When Texas adopted this clause, it was no announcement of a new right to a person accused of crime, but was simply a preservation of a right that was a part of the law of England, of this Union and of almost every State therein, and in arriving at a proper construction thereof, we must look to the decisions of England, the United States, and the different States therein that were in existence at the birth of the Texas Republic.

**6.—Same—Rule Stated—Laws Adopted from Other State.**

It is a well-known rule of law that when we adopt a phrase or borrow a provision from the Constitution or laws of another State or country, we adopt that clause with the construction placed thereon by the courts of that State or country.

**7.—Same—History of Legislation—Declaration of Independence.**

In construing this language of our Constitution we should look to the period when the colonies were a part of the English domain, and prior to the Declaration of Independence.

**8.—Same—Right of Being Confronted by Witness.**

All text-writers of any note, as well as all the courts of last resort, adhere to the line of decisions that the testimony of a deceased witness, or a witness beyond the jurisdiction of the court, may be reproduced where the accused has once been confronted by the witness. Davidson, Presiding Judge, dissenting.

**9.—Same—Legislative Intent.**

The framers of the Texas Constitution could certainly have had no intention of placing a different construction on this language than that which had been placed on it at the time of its adoption by this State.

**10.—Same—Common Law of England—Rule of Decision Since 1836—Judicial Construction—Civil Law.**

The Constitution of 1836, and the decisions thereon, declare that the Common Law of England, not the Civil Law, should be the rule in criminal cases in Texas, and our Supreme Court has held since that time that testimony of a dead witness, etc., could be reproduced.

**11.—Same—Rule Stated—Confronting Witnesses.**

The law of this State is that when the testimony of a witness has been taken in the course of a judicial proceeding and the accused has had the opportunity to cross-examine him, and the witness dies, becomes insane, moves beyond the jurisdiction of the State, or is kept away by the wrongful acts of the accused, then the testimony of such a witness can be introduced in evidence at a subsequent trial. Davidson, Presiding Judge, dissenting.

Appeal from the Criminal District Court of Galveston. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Marsene Johnson, Aubrey Fuller, Elmo Johnson, A. S. Fisher,* for appellant.—On the question of admitting defendant's testimony on the former trial, etc.: Harding v. State, 57 Texas Crim. Rep., 401.

On the question of reproduction of testimony of a dead witness or one beyond the jurisdiction of the court: Cline v. State, 36 Texas Crim. Rep., 320, and authorities cited in minority opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted by the grand jury of Galveston County, charged with murder; he was convicted of murder in the second degree and his punishment assessed at confinement in the penitentiary for five years.

This is the second appeal in this case, the report of the former trial being found in 54 Texas Crim. Rep., 21. Since the former trial of this case one of the witnesses for the State, L. Rodriguez, had died, and another, R. Mori, had returned to Italy, and is domiciled in that country. Appellant complains that the State was permitted to reproduce the testimony of these two witnesses given at the former trial, alleging that under the Constitution he is entitled to be "confronted by the witnesses against him." He also complains that the State was permitted to introduce his testimony on the first trial of the case, saying, as he did not testify on this trial, it should not have been permitted.

These are all the grounds relied on for a reversal of the judgment in the motion for a new trial. The third ground—that the testimony of defendant on the first trial could not be introduced in evidence against him on a subsequent trial—has been decided by this court adversely to appellant's contention. Smith v. State, 75 S. W. Rep., 298; Preston v. State, 41 Texas Crim. Rep., 300; Collins v. State, 39 Texas Crim. Rep., 441, and authorities cited in these cases.

The other two grounds may be considered jointly, as they present the same question—Can the testimony of a witness adduced on one trial be reproduced against a defendant on a second or subsequent trial when the witness has, since the first trial, died or gone beyond the jurisdiction of the court? The questions here presented have been the cause of much controversy in this court since the decision in the case of Cline v. The State, 36 Texas Crim. Rep., 320. The Cline case was overruled in the case of Porch v. The State, 51 Texas Crim. Rep., 7, and recently the Porch case has been overruled, and the rule announced in the Cline case held to be correct in the case of Kemper v. State, 63 Texas Crim. Rep., 1, 138 S. W. Rep., 1025.

The writer did not sit in the Kemper case, having been of counsel in the trial court, and the opinion is by Judge Scott, who served as special judge. We agree with the contention of Judge Scott in that case, that the Constitution is the highest law in the land, and is binding upon all courts and legislative bodies, neither having the right to make any innovation upon that instrument; however, we hold it is the duty of the courts to construe the Constitution, and in doing so, should a different construction be placed thereon than that announced in the Kemper case, it would not be an innovation on the Constitution, but only a correct enunciation of the language of that instrument and making it speak what it was intended it should speak. The Constitution of 1876, in the Bill of Rights, provides in section 10 that the accused "shall be confronted by the witnesses against him."

The Constitution of the Republic of Texas, in 1836, when, after

the battle of San Jacinto and defeat of Santa Anna, a republican form of government was here instituted, this exact language was used. Again in 1845, when, after knocking at the door, Texas was admitted into the sisterhood of States, this same language was brought forward in the organic law, and was also reiterated in the Constitutions adopted in 1861, 1866 and 1869. The language has been the same in each of these instruments.

The sixth amendment to the Constitution of the United States provides that the accused shall have the right to be "confronted with the witnesses against him," and this same language is written into the supreme law of almost every State in the Union, and was embodied in the Constitution of the United States, and the different States of the Union prior to the date of the organization of the Republic of Texas, and at the time of its admission into the Union. Consequently Texas but borrowed or copied this provision from the Constitutions and laws of the different governments of the English speaking people. Owing to the different constructions placed on this provision of the Bill of Rights by this court at different periods of its existence, we have given the question more than usual consideration, and have searched not only the decisions of our own State, but those of the courts of the United States and of the courts of last resort of the different States, and have also burrowed into the rule of construction and the construction given this language by the courts of England, prior to the Declaration of Independence by the colonies. It is recognized by all courts that this provision was a part and parcel of the English law at the time of the revolt of the colonies and the establishment of this Union, and we, in adopting this clause, but reiterated what was the law in the colonies prior to our Independence. So, when Texas adopted this clause, it was no announcement of a new right to a person accused of crime, but was simply a preservation of a right that was a part of the law of England, of this Union, and of almost every State therein, and in arriving at a proper construction thereof, and to give the language its proper meaning, we must look to the decisions of England, of the United States and the courts of the different States in the Union, for, of such of them as were in existence at the birth of the Texas Republic, they had long had this principle embodied in their system of government, and it is a well-known rule of law that when we adopt a phrase or borrow a provision from the Constitution or laws of another State or country, we adopt that clause with the construction placed thereon by the courts of that State or country. In speaking of the Constitution of the United States and the amendments thereto, the Supreme Court, in Brown v. Walker, 161 U. S., 591, says: "As the object of the first eight amendments to the Constitution was to incorporate into the fundamental law of the land certain principles of natural justice which had become permanently fixed in the jurisprudence of the mother country, the construction given to those principles by the English courts is cogent evidence of

what they were designed to secure and of the limitations that should be put upon them. This is but another application of the familiar rule that, where one State adopts the laws of another, it is also presumed to adopt the known and settled construction of those laws by the courts of the State from which they are taken." In 1831, prior to the time Texas was admitted into the Union, the United States Supreme Court had held: "The statutes passed in England before the emigration of our ancestors, which were in amendment of the law, and are applicable to our situation, constitute part of our common law." (Patterson v. Winn, 5 Pet., 233; Taylor v. Thompson, 5 Pet., 358). And in the case of Cathcart v. Robinson, 30 U. S., 264, it is held: "The construction which British statutes had received in England at the time of their adoption in this country, indeed to the time of the separation of this country from the British empire, may very properly be considered as accompanying the statutes themselves, and forming an integral part thereof." These opinions and enunciations of the law were written by such eminent jurists as Chief Justice Marshall and Mr. Justice Storey. In a later case, 110 U. S., 619, Mr. Justice Bradley, speaking for the court, says: "It is a received canon of construction acquiesced in by this court, that where English statutes have been adopted into our own legislation, the known and settled construction of those statutes by courts of law has been considered as silently incorporated into the acts, or has been received with all the weight of authority." Mr. Cooley, in his work on Constitutional Limitations, says: "The colonists also had Legislatures of their own, by which laws had been passed which were in force at the time of their separation, and which remained unaffected thereby. When, therefore, they emerged from the colonial condition into that of independence, the laws which governed them consisted,—first, of the common law of England, so far as they had tacitly adopted it as suited to their condition; second, of the statutes of England or of Great Britain amendatory of the common law, which they had in like manner adopted; and, third, of the colonial statutes. The first and second constituted the American common law." And Mr. Storey, Mr. Black and others lay down the rule of construction to be: "Where a clause or provision in a Constitution, which has received a settled judicial construction, is adopted in the same words by the framers of another Constitution, it will be presumed that the construction thereof was likewise adopted."

The Am. & Eng. Ency. of Law, Vol. 6, p. 277, lays down the rule: "It may be stated as a general rule that English statutes passed before the emigration of our ancestors, in aid or amendment of the common law, applicable to our condition, and not repugnant to our institutions and form of government, constitute a part of our common law," citing the following authorities: Patterson v. Winn, 5 Pet., (U. S.), 240; Van Ness v. Pacard, 2 Pet., (U. S.), 144; Ex parte Watkins, 7 Pet., (U. S.), 568; Carter v. Balfour, 19 Ala., 814; Horton v. Sledge, 29

Ala., 478; Matthews v. Ansley, 31 Ala., 20; Pierson v. State, 12 Ala., 149; Norris v. Harris, 15 Cal., 226; State v. Cummings, 33 Conn., 260, 89 Am. Dec. 208; Hunt v. Chicago, etc., Ry. Co., 20 Ill. App., 289; Swift v. Tousey, 5 Ind., 196; State v. Buchanan, 5 Har. & J. (Md.), 356, 9 Am. Dec. 534; Baker v. Crandall, 78 Mo. 584, 47 Am. Rep., 126; Hamilton v. Kneeland, 1 Nev., 40; Ex parte Blanchard, 9 Nev. 101; Evans v. Cook, 11 Nev., 69.; Bogardus v. Trinity Church, 4 Paige (N. Y.), 178; Lansing v. Stone, 37 Barb. (N. Y.), 15; Van Rensselaer v. Hays, 19 N. Y. 68, 75 Am. Dec. 278; Miller v. Miller, 18 Hun (N. Y.), 512; Pemble v. Clifford, 2 McCord L. (S. Car.), 31; Simpson v. State, 5 Yerg., (Tenn), 356; Porter v. State, Mart. & Y., (Tenn.), 226; Com. v. Lodge, 2 Gratt., (Va.), 580; Coburn v. Harvey, 18 Wis., 148.

Thus we see that to arrive at a proper construction of this language of our Constitution we should look to the period when the colonies were a part of the English domain, and prior to our Declaration of Independence, for it follows whatever construction had been placed on this language, the right of the "accused to be confronted by the witnesses against him," by the courts of England prior to that date, is the proper and only legitimate construction for the courts of the United States to place thereon when it was incorporated into our law. By examination of such books as we have at our command, treating of that period, we find that in the fifteenth century the rule was "that the examination of an informer taken upon oath, and subscribed by him either before a coroner upon an inquisition of death in pursuance of 1 and 2 Philip and Mary, c. 13, or before a justice of the peace in pursuance of 1 and 2 Philip and Mary, c. 13, and 2 and 3 Philip and Mary, c. 10, upon a bailment or commitment for any felony, may be given in evidence at the trial of such inquisition, or of an indictment for the same felony, if it be made out by oath to the satisfaction of the court, that such informer is dead, or unable to travel, or kept away by the means or procurement of the prisoner, and that the examination offered in evidence is the very same that was sworn before the coroner or justice, without any alteration whatever." (See Hawkins' Pleas of the Crown, p. 592.) It is true that subsequent to this time, during the reigns of Queen Elizabeth and King James the First, in the trials of Sir Walter Raleigh and others it was held that such testimony was admissible even though taken in the absence of the accused; however, Hawkins in his Pleas of the Crown lays down the rule in England that the testimony is admissible only if taken in the presence of the prisoner and the witness has since died or from sickness or other cause can not be brought into court, and in this connection he also says the deposition extra-judicially taken (when the accused is not present) may, in the particular case of murder, be read as the dying declarations of the deceased if in extremis or in such state of mortality as to render the apprehension of approaching dissolution probable.

Sir Matthew Hale, in his "Pleas of the Crown," page 283, Vol. 2, says: "By the statutes of 1 and 2 Philip & Mary, and 2 and 3 Philip & Mary, justices of the peace and coroners have power to take examinations of the party accused and information of the accusers and witnesses and are to put the same in writing and are to certify the same to the next goal-delivery. These examinations and informations thus taken and reduced may be read in evidence against the prisoner if the informer be dead, or so sick that he is not able to travel." Roscoe in his work on Criminal Evidence (page 69), says: "Depositions are admissible as substantive evidence at common law, should the witness be either dead, or be in such state as never to be likely to be able to attend assizes, or if the witness be kept away by the practices of the prisoner."

Mr. Starkie in his work on Evidence, page 409, says: "Depositions of witnesses, although made under the sanction of an oath, are not in general evidence as to the facts which they contain, unless the party to be affected by them has cross-examined the deponents, or has been legally called upon, and had the opportunity to do so; for otherwise one of the great and ordinary tests of truth would be wanting. Evidence of this kind is weak and is not admissible, unless it be the best evidence which can be procured, and also unless the party against whom it is offered, or the party under whom, he claims, has had the power of cross-examination, and has been legally called on to examine; which must be proved by showing that he was a party to the proceeding; that it was a judicial proceeding; and that he did cross-examine, or might have done so. There are some exceptions where the proceeding is of a public nature, or the evidence falls within the general scope of the rule as to reputation.

"It is an incontrovertible rule, that when the witness himself may be produced, his deposition can not be read, for it is not the best evidence. But the deposition of a witness may be read, not only where it appears that the witness is actually dead, but in all cases where he is dead for all purposes of evidence; as where diligent search has been made for him and he cannot be found, where he resides in a place beyond the jurisdiction of the court, or where he has become lunatic or attainted."

Mr. Best, in his work on Evidence (p. 843) says: "On a second trial of a cause between the same parties, the evidence of a witness examined at a former trial, and since deceased, is receivable, and may be proved by the testimony of a witness who heard it, or by notes made at the time," citing 1 Phill. Ev., 306.

These were all eminent lawyers of their day and time, and writers of ability and betoken a familiarity with the English law. Sir Matthew Hale was at one time Chief Justice of the King's Bench, and his work was written in the sixteenth century, while that of William Hawkins was written in the seventeenth century, about fifty years prior to the Declaration of Independence by the colonies. In

these various books many authorities are cited, decisions which were rendered prior to the war between this country and England, and while the colonies were still a part of the English possessions, it being held in Rex v. Payne, (1 Ld. Raym., 729), "information of a person since dead may be read on indictment for felony." In 9 Mod., 330: "Depositions of witnesses who are abroad received in evidence." 5 Mod., 163: "The examination of witnesses before justice of the peace may be given in evidence at a trial." 3 Salk., 101: "Depositions taken before coroner may be given in evidence upon an indictment of murder, if the witnesses are dead."

Many other English authorities might be cited, but we deem it unnecessary.

One of the most noted American authors, Mr. Greenleaf, in his work on Evidence, lays down the rule: "Testimony of a witness given on a former trial, where the parties had an opportunity to examine him, may be received if the witness is dead, or is out of the jurisdiction, or insane and unable to testify, or if he has been summoned and is kept away by the adverse party." 1 Greenleaf Ev., sec. 163 and cases cited.

Hughes in his work on criminal law, says, sec. 3014: "If a witness testified at a former trial and was then cross-examined, his testimony, so given at such former trial, may be introduced at a subsequent or second trial, if he has since died."

Mr. Jones, in his work on Evidence, lays down the rule that evidence given at a former trial may be admitted in four instances: First, where the witness is dead; second, where he is insane or mentally incapacitated; third, where he is beyond the seas, and fourth, where he has been kept away by the connivance of the opposite party.

Rice, in his work on Evidence, says: "The evidence of a witness since deceased, on a former trial of the same case may be proven on a subsequent trial. Such proof does not violate the defendant's constitutional right to meet the witness face to face. In criminal prosecutions in this country depositions are rarely employed, but where the accused has had an opportunity to cross-examine the witness whose depositions it is sought to introduce he has no reason to complain that the constitutional guarantee has been violated. Such instances arise where, in a former trial, the accused was confronted with the witness, or on preliminary hearing before a coroner or committing magistrate. And it seems that notes taken on such occasions are admissible in evidence where the witness has since died or is beyond the jurisdiction of the court."

Wharton, in his work on the Law of Evidence, in secs. 177 and 178, says where a witness is dead or beyond the jurisdiction of the court, the evidence is admissible and that the general rule is thus given by Mansfield, C. J.: "Where a witness, since dead, has sworn upon a trial between the same parties, may be given in evidence, either from the judge's notes, or from the notes that may have been taken by

any other person who will swear to their accuracy; or the former evidence may be proved by any person who will swear from his memory to its having been given."

In fact, every text writer of any note, or that has been recognized by the courts of last resort, so far as we have been able to ascertain, adheres to that line of decisions which holds that the testimony of a deceased witness, or a witness beyond the jurisdiction of the court, may be reproduced where the accused has once been confronted by the witness. However, we did not desist after reading the text-books, but have searched the reports of the decisions of the United States Courts, and the courts of the various States in the Union and find them practically of one opinion—that the proper construction of this clause of the Constitution means only that the accused has the right to be confronted with the witness once that he may cross-examine him. And the framers of the Texas Constitution could certainly have had no intention of placing a different construction on this language than that which had been placed on it at the time of its adoption by this State. To place the construction on this language that is placed on it in the Cline case and the Kemper case, supra, would put this court in conflict with all the great lawyers who have presided in the courts of last resort in our sister States. To show how unanimous the courts of the different States have been, in adopting the construction placed on this language by England and the earlier law writers, we will quote excerpts from a number of the States. Alabama holds, Marler v. State, 67 Ala., 55:

"The main question presented for our consideration in this case, is the admissibility of the witness Roberts' testimony as to what one Redman had previously sworn on the preliminary investigation before the committing magistrate. Redman had there testified for the State, under the sanction of an oath, subject to a full cross-examination by the defendant. Before the trial in the Circuit Court, in which he was jointly indicted with the appellant Marler, he became insane and was so pronounced by the verdict of a jury and the judgment of the court, after which a severance of the case was granted. The court admitted the substance of Redman's testimony as given before the magistrate, to be proved, to which an exception was taken, and this ruling of the circuit judge is assigned as error.

"The general rules of evidence at common law, subject to few exceptions, are the same in civil and criminal cases, being more liberal at least in some instances in the latter than the former. Dying declarations, for example, are never admissible in civil cases, but only in charges of homicide. It is manifest indeed that the danger of perjury is not usually so great in matters of crime, which government and society are chiefly interested in punishing, as in these cases involving large pecuniary interests, as the experience of mankind has taught in all countries where nuncupative wills have been allowed. 2 Best Ev., sec. 505.

"It is now established beyond disputation that where a witness has testified under oath, in a judicial proceeding, in which an adverse litigant was a party, and was subject to cross-examination, the testimony so given is admissible, after the decease of the witness, in any subsequent suit between the same parties. 1 Greenleaf Ev., 163; Best Ev., sec. 496; 1 Phil. Ev., (C. H. & E.), 389, note; 2 Russ. Cr., 683. And in Horton v. State, 53 Ala., 488, this principle was declared 'applicable alike to civil and criminal cases,' and this court on the strength of it, sustained the admission of the testimony of a deceased witness, taken down by a commiting magistrate on preliminary investigation, when introduced on trial under indictment in the Circuit Court.

"Such testimony is not liable to the objections ordinarily urged against hearsay or derivative evidence, for it was delivered under the sanction of an oath, and the adverse party has had or might have had the full benefit of a cross-examination. 1 Stark. Ev., 42. . . . 'The admission of such evidence,' says Mr. Wharton, 'is based upon the fact that the party against whom the evidence is offered having had the power to cross-examine at the former trial, and the parties and issues being the same, the second suit is virtually a continuation of the first.' Law of Ev., sec. 177.

"We are of opinion that the reason of the rule applies with unanswerable force to all cases where the witness has become insane. As said by Lord Kenyon in Rex v. Eriswell, 3 T. R. 707, he is to all intents and purposes to be considered 'in the same state as if he were dead.' And though the question was left undecided in that case, Buller, J., concurring with Lord Kenyon, regarded the party 'as dead, he being in such a state as to render it impossible to examine him.' Id. 391.

"A case, however, clearly in point is that of Regina v. Marshall, Car. & Mar. 147. It was there held that where a witness was actually insane at the time of the trial on indictment his deposition taken before the committing magistrate, could be read the same as if he were dead, although the insanity be but temporary; but not where the witness was suffering from delirium through injuries produced by a blow on the head, if his physician was of opinion he would recover. In Rex v. Hogg, 6 C. & P., 176, where a prosecutor in a case of felony was bedridden, and there was no probability that she would ever be able to leave her home, her deposition taken before the magistrate was held admissible in the same manner as if she were dead. In the Earl of Strafford's case it was adjudged, 'that where witnesses could not be procured to testify viva voce, by reason of sickness, etc., then their depositions might be read, for or against the prisoner, but not when they might have been produced in person.' 2 Hawk. Pl. Cr., ch. 46, sec. 20.

"There seems to be no difference of opinion on this question among

the best text writers. Mr. Greenleaf asserts that such evidence is admissible, 'if the witness, though not dead, is out of the jurisdiction, or can not be found after diligent search, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the adverse party.' Mr. Wharton takes the same view, thinking the rule applies 'when, from the nature of the illness or infirmity, no reasonable hope remains that the witness will be able to appear in court on any future occasion,' and he adds: 'Mental incapacity, from whatever cause, is a sufficient inducement. It has been said that if the insanity is temporary, the true course is to continue the cause until the witness recovers; but the contrary view has been expressed by an English court, and there are some classes of cases (e. g. criminal of high grade) in which such a continuance can not in law be granted, and others in which the inconvenience would be so great as to amount to an obstruction of justice.'

"The annotator of Phillips on Evidence approves the application of the principle in question to cases where the witness has become insane, and others of like character, and arrives at the conclusion that 'those (cases) which have come nearest to the liberal principle on which secondary evidence is generally received, are less anomalous and therefore more scientific than the narrower decisions.' 1 Phil. Ev., (C. & H. and E's. notes), 393.

"Mr. Justice Cheves in Drayton v. Wells, 1 Nott and McCord, 409, says: 'The books enumerate four casese only in which the testimony of a witness, who has been examined in a former trial, between the same parties and where the point in issue is the same, may be given in evidence on a second trial, from the mouths of other witnesses, who heard him give evidence: 1, when the witness is dead; 2, where he is insane; 3, where is beyond seas; 4, where the court was satisfied that the witness had been kept away by the contrivance of the opposite party.'

"In Emig v. Diehl, 76 Penn. St., 359, the rule as enunciated by Mr. Greenleaf is indorsed by Sharswood, J., and was applied to one in such a state of senility as to have lost his memory, all of the seven judges concurring on this particular point.

"In Rogers v. Raborg, 2 Gill. and J., 54, the Supreme Court of Maryland admitted the deposition of a paralytic, who though regularly summoned as a witness, was unable to leave his home, or speak so as to be understood. The court declared the evidence admissible on the ground of necessity, the witness being the same as if he were dead.

"The courts of Louisiana have gone so far as to admit such testimony in the case of the temporary sickness of a witness. In Miller v. Russell, 7 Mart. 266, where a witness had been examined and notes of his testimony carefully taken, the court said: 'To have examined him again, laboring under disease, would have afforded no better evidence, perhaps not so clear, as that which had been obtained from him on the former trial.' But as Lord Ellenborough suggested in Harrison

v. Blades, 3 Camp., 458, in such cases it should appear that the sickness is of character imposing permanent inability, as otherwise there would be very many sudden indispositions and recoveries.

"In Kendrick v. State, 10 Humph., 479, the Supreme Court of Tennessee indorsed the principle admitting the testimony of a deceased witness given on a former trial, and declared the maintenance of the rule in criminal cases to be of far greater importance to the lives and liberty of defendants than of mere justice to the State.

"This court, in Long v. Davis, 18 Ala., 801, admitted the deposition of a witness taken in a former suit, after his removal from the State, in a subsequent suit between the parties. Chilton, J., said: 'We think the more liberal doctrine which allows a permanent absence from the jurisdiction as an excuse, is more consonant with the legal analogies, and is sustained by the preponderance of authority.'

"It has been held by some of the courts, including those of New York and Virginia, that no evidence of this character, save that only of deceased witnesses, is admissible in criminal cases, but this view, we believe, is opposed to both the weight of reason and the preponderance of authority. Whether originating in necessity or based on expediency, the purpose of the rule is to prevent the defeat of justice; and tested by this principle there is no real or practical difference between the death of the mind and the death of the body. If a man's reason be utterly dethroned, it were all one, in the eye of the law, so far as regards his capacity to testify, that his body were in the grave.

"It is very clear that such evidence is no more a violation of the constitutional right of every citizen to be confronted by his witnesses, than the admission of dying declarations, and in fact, much less so, as the defendant has once exercised this right, and had an opportunity to elicit the truth by cross-examination. Kendrick v. State, 10 Humph., 479; Com. v. Richards, 18 Pick., 434, 29 Am. Dec., 608; Green v. State, M. S. Dec. T., 1880." See, also, 68 Ala., 515; 96 Ala., 51; 86 Ala., 52; 87 Ala., 30; 92 Ala., 41; 86 Ala., 217; 17 Ala., 354.

Arkansas holds, Pope v. State, 22 Ark., 372: The testimony of a deceased witness examined on a former trial on a criminal charge may be proved on a second trial for the same offense, and in Hurley v. State, 29 Ark., 17, it is said the same rule applies where the witness is beyond the jurisdiction of the court. See, also, 33 Ark., 539; 47 Ark., 180.

California holds, People v. Plylor, 126 Cal., 377: The statute allowing the reporter's notes of the testimony of a witness taken at the preliminary examination to be introduced at the trial upon its being satisfactorily shown to the court that the witness is dead, or insane, or can not, after due diligence, be found in the State, is constitutional and valid. See, also, 66 Cal., 101; 108 Cal., 597; 116 Cal., 250; 117 Cal., 10; 46 Cal., 46.

Georgia: The case of Pittman v. The State, 92 Ga., 480, is cited

in the Kemper case as supporting the doctrine that such evidence is inadmissible, but it does not so hold. That case holds that if the witness is dead the testimony may be reproduced on a second trial, but does say that it can not be done if the witness is still living and in the case of Robinson v. The State, 68 Ga., 833, it is held: Where a witness who testified at a committing trial subsequently died, on the final trial of the same case in the Superior Court, his testimony so given was admissible and cites 45 Ga., 283; 61 Ga., 488; 63 Ga., 692; 71 Ga., 128.

Idaho holds, Territory v. Evans, 2 Idaho, 651: Depositions taken in the presence of the accused may be used on trial when on account of death or other good cause, the presence of the witness can not be had, nor is it in violation of the sixth amendment to the Constitution of the United States.

Illinois holds, Barnett v. The People, 54 Ill., 325: "It is next urged that the court below erred in admitting evidence of what Hardy Setts swore at the examination of the prisoner before the justice of the peace. Hardy Setts was dead when this case was tried in the court below, but the witness heard and remembered the testimony. The rule as to the admissibility of evidence is the same in civil and criminal trials, except in criminal trials dying declarations may be received. Nor does the supposed constitutional objection arise to such evidence, as the witness was confronted with the accused (at the examining trial) and he was afforded an opportunity of cross-examination in the examining court," citing authorities.

Indiana holds, Sage v. The State, 127 Ind., 15: "No error was committed in permitting the official stenographer to read from his report of the testimony of a witness given at a former trial, who has since died. That the testimony of a deceased witness may be repeated at a subsequent trial is well settled. It is also settled that the reproduction of the testimony of a witness, who was examined at a former trial, is not a violation of the fundamental rule that the deceased has a right to be brought face to face with the witness against him," citing authorities.

Iowa holds, The State v. Fitzgerald, 63 Iowa, 268: "It is further claimed that the evidence was incompetent under section 10 of article 1 of the Constitution which provides that in all criminal prosecutions the accused shall have a right to be confronted by the witnesses against him." This constitutional provision is common to most if not all the States of the Union, and it has been quite uniformly held that it is not violated by the admission of testimony in a criminal case to prove what a deceased witness testified to at the preliminary examination of the accused before a justice of the peace or other examining magistrate," citing authorities.

Kansas holds, State v. Wilson, 26 Kans., 189: "In this cause the examination was held when the charge against accused was assault to murder. The witness subsequently died. The accused declined to

attend the examination, but was represented by counsel, and the court holds the testimony so taken was admissible." See opinion for authorities cited.

Kentucky holds, O'Brien v. Commonwealth, 69 Ky., 563: "The rule seems to be that where the witness is dead, his evidence judicially taken in one proceeding, may be used in another proceeding between the same parties, the party against whom the evidence is offered having had an opportunity to cross-examine in the former proceeding. And it is said the same principle applies where there are two trials; thus, if a witness has died between the first and second trials, it may on the second trial be proved what he swore on the first, a doctrine which prevails in criminal cases as well as in civil, and in general in the United States as well as in England."

Louisiana holds, State v. McNeil, 33 La. Ann., 1332: "The law in England and this country, relating to depositions taken before coroners, as to the manner of taking and the effect given them, and the purposes for which they could be used or applied, at and before the time mentioned (1805), is embraced and contained in the act known as 1 and 2 Phil. & M., c. 13, sec. 5, A. D. 1854.

"This statute remained in full force in England until its provisions were to some extent modified, first by the statute 7 Geo., IV, c. 64, and afterwards by the 11 & 12 Vict., c. 42, passed long subsequent to 1805.

"Archbold, commenting on these statutes, says: 'Although the former statutes (Phil. & M.) did not contain any express enactment like the above (11 & 12 Vict.), it was yet determined in many cases and recognized as a rule of law, that, in all cases of felony under these statutes, where they were taken in presence of the accused, and he had an opportunity of cross-examining them, the deposition of any such witness might be read in evidence against the accused on trial in case the person who made the depositions were dead." Archbold Pl. & Ev., 13 Lond. Ed., 213, 214. . . .

"We read from Bishop on same subject: 'How. in United States.' 'Such being the English law, and the two statutes of Philip & Mary being common law with us, the practitioner, by consulting the statute book of his own State, may readily determine how the matter stands there. The principle on which these depositions are, under statutes like those which prevailed in England down to a recent period, admissible, is, that being regularly taken under provisions of law, the common law accepts them, when it is impossible the personal presence of the witness can be had.' 1 Bish. Crim. Pro., 1096; Rex v. Smith, 2 Starkie, 208, 211."

Missouri holds, State v. McO'Blens, 24 Mo., 402: "A deposition of a witness taken upon the preliminary examination before a committing magistrate in the presence of the accused may be received in evidence on the trial upon proof of death of such witness. The provision of the Constitution of this State declaring 'that in all criminal prosecutions the accused has the right to meet the witnesses against

him face to face' does not render such evidence inadmissible." 26 Mo., 105; 65 Mo., 357; 90 Mo., 350.

Michigan holds, People v. Dowdigan, 67 Mich., 95: "The testimony of a witness taken on a preliminary examination in a criminal case is admissible in evidence on the trial on proof of the death of the witness, and does not violate any constitutional right."

Minnesota holds, State v. George, 60 Minn., 503: "Where a witness against the defendant on the trial of a criminal case dies before a subsequent trial, his testimony on the former trial may be given in evidence on the subsequent trial. The same rule should be applied when the evidence was given on the preliminary examination of the defendant and the witness dies before the trial."

Massachusetts holds, Commonwealth v. Richards, 18 Pick., 434: "The 12th article of the Declaration of Rights, which provides that in criminal cases the accused shall have the right 'to meet the witnesses against him face to face' is not violated by the admission of testimony in a criminal trial before a jury to prove what a deceased witness testified at the preliminary examination of the accused before a justice of the peace."

Mississippi holds, Owen v. The State, 63 Miss., 450: "It is well established that the testimony of a deceased witness given under oath in a judicial proceeding between the same parties on the same issue, is competent, both in civil and criminal cases, for either party, when the party against whom the testimony is offered had opporunity to cross-examine the witness on the former proceeding." This case is cited in the Kemper case as supporting that decision but it in fact holds the exact reverse, and holds the testimony is admissible when the witness is dead, but says if the witness is living, he must be produced.

Montana holds, State v. Byers, 16 Mont., 565: "A transcript of the stenographer's notes of the testimony which a witness, since deceased, gave at a preliminary examination, supported by the testimony of the stenographer as to its correctness, is admissible against the defendant on the trial of the case, where the defendant had cross-examined the witness at the preliminary examination."

Nebraska holds, Hair v. The State, 16 Neb., 601: "Where a deceased witness testified upon a former trial of the same party for the same offense, being brought 'face to face' with the accused and cross-examined by him, it is competent, upon a subsequent trial, to prove the testimony of such deceased witness, and such proof does not violate the provisions of the Constitution of the State, which gives the defendant the right to 'meet the witnesses against him face to face.'"

Nevada holds, State v. Johnson, 12 Nev., 118: The objection made was that the testimony was inadmissible and that defendant was entitled to be confronted by the witness whose testimony was given against him. The court holds, whatever differences of opinion may have in former times existed upon this question, the rule is now too

well settled to require any discussion that the testimony of a deceased witness, given under oath in a proceeding authorized by law, where the opposite party had the opportunity of a cross-examination, is admissible evidence against such party at a subsequent trial.

New York holds, People v. Elliott, 172 N. Y., 146: "Section 8 of the Code of Criminal Procedure provides 'that the defendant shall be confronted with the witnesses against him in the presence of the court. This is merely a reenactment of the Bill of Rights which provides in sec. 14 that the accused shall be confronted with the witnesses against him.' . . . It is manifest from the authorities permitting the deposition or evidence of a deceased witness to be read upon a trial of the accused, that it has not been deemed essential that he should be confronted by the witnesses against him upon the trial itself; but if the evidence be taken in the course of the proceeding in his presence, and with the right and privilege of cross-examination secured to him, that will be sufficient to allow the deposition to be read, in case of the decease of the witness."

North Carolina holds, State v. King, 86 N. C., 604: "Such testimony has been declared competent in this State when the witness is dead, or after search, can not be found, and perhaps, the rule would have been extended to the case of a nonresident who was absent, beyond the jurisdiction of the court, as stated by Mr. Wharton in his law of evidence, sec. 178."

Oregon holds, State v. Walton, 53 Ore., 557: "The Constitution provides that in all criminal prosecutions the accused shall have the right to meet the witnesses face to face, and it is contended that the admission of the testimony given on a former trial of the accused was an infringement of this right. The Constitution of the United States, and of most States of the Union contain similar provisions, and the general, if not the universal, holding of the courts is to secure to an accused the right of cross-examination, and if he has once enjoyed that right, no constitutional privilege is violated by the admission of the testimony of such witness who is dead or absent from the State at a subsequent trial."

Ohio holds, Summons v. The State, 5 Ohio, 325: "1. It is claimed, that the admission of testimony against the accused in a criminal case, to prove the statements given as evidence on a former trial of the cause, by a witness since deceased, contravenes the provision of the tenth section of the Bill of Rights, which provides that, in any trial in any court, the party accused shall be allowed (among other things) to meet the witnesses face to face.' This, like numerous other provisions in the bill of rights, is a constitutional guaranty of one of the great fundamental principles well established, and long recognized at common law, both in England and in this country. The scope and operation of it are clearly defined and well understood, in the common law recognition of it; and the assertion of it in the fundamental law of the State, was designed neither to enlarge nor curtail it in

its operation, but to give it permanency, and secure it against the power of change or innovation.

"The object of this provision manifestly is to exclude testimony by depositions, by requiring it to be given orally, in the presence of the accused, on the trial. The admission of testimony by depositions against the accused in a criminal cause, would often afford the prosecutor great advantage over him, as well as furnish, at times, opportunities for abuses beyond the reach of detection by the defendant. Deprived of this right, the accused would often be without the opportunity of cross-examination, without the means of seeing, hearing, or knowing the persons who testify against him, and without the advantage of an oral examination of the witness before the jury which is to decide upon his case. But important as this right is, as established at common law, and secured by the Constitution, it has application to the matter of the personal presence of the witness on the trial, and not to the subject matter or competency of the testimony to be given. The requirement that the accused shall be confronted, on his trial, by the witness against him, has sole reference to the personal presence of the witnesses, and in no wise affects the question of the competency of the testimony to which he may depose. When the accused has been allowed to confront, or meet face to face, all the witnesses called to testify against him on the trial, the constitutional requirement has been complied with. This was done on the trial of the case before us, in the district court. Mary Clinch was not a witness on that trial. Being dead, it was an impossibility that she could be a witness on that trial. Logan, however, who was a witness, and did testify, did meet the accused face to face on the trial. The provision in the Bill of Rights was complied with. And the true question is, not whether the constitutional right of the accused was violated, but whether the testimony given by Logan on the trial was competent or not.

"There are several well established exceptions to the rule that hearsay is not evidence. But if the right secured by the Bill of Rights applies to the subject matter of the evidence, instead of the witness, it would exclude, in criminal cases, all narration of statements or declarations made by other persons, heretofore received as competent evidence. The construction insisted on for the plaintiff in error, treats the person whose statements or declarations are narrated, as the witness, rather than the person who testifies on the trial. This construction would exclude all declarations in articulo mortis, by confounding the identity of the dying man with that of the witness called upon in court to testify to such declarations. Precisely the same objection would exclude all declarations by coconspirators—statements made in the presence of the accused in a criminal case, and not denied by him; and the statements by the prosecutrix in prosecutions for rape, made immediately after the commission of the offense. And, by a parity of reasoning, the admissions or confessions of the accused,

and, in prosecutions for perjury, the very testimony of the accused on which the perjury may be assigned, would be excluded by the provision in the Bill of Rights forbidding that any person shall be compelled, in any criminal case, to be a witness against himself.

"The constitutional objection has been, on several occasions, urged against the admissibility of dying declarations. And there would seem to be even more reason for the exclusion of this, than evidence of the statements of a deceased witness on a former trial. For the latter would seem to be now confined to cases where opportunity for cross-examination had been afforded, and, therefore, to cases where the accused had been confronted by the deceased witness when the testimony was given on the former trial. But the competency of the testimony of dying declarations in cases of homicide, appears to have been so well settled by adjudications, that it will scarcely be questioned hereafter. Commonwealth v. Hill, 2 Grat., 594; Campbell v. State, 11 Georgia, 353; Woodside v. State, 2 How. (Miss.), 655; Penn v. Stoops, Addison R., 381; State v. Arnold, 13 Iredell, 184; McLean v. State, 16 Alabama R., 672; State v. Cameron, 2 Chand. (Wis.), 172; Greene v. State, 13 (Miss.) R., 382; State v. Shawley, 4 Harr. (Del.), 562; Commonwealth v. McPike, 3 Cush., 181; Montgomery v. State of Ohio, 11 Ohio Rep., 424.

"Testimony of the statements of deceased witnesses given on a former trial, between the same parties, touching the same subject matter, has been admitted among the exceptions to the rule excluding hearsay evidence, from a very early period, and has been sanctioned by an unbroken current of decisions, both in England and in this country. It has been received ex necessitate, and under proper precaution, as secondary evidence, being the best evidence the circumstances of the case admit of. The main reason for the exclusion of hearsay evidence, is to be found in the want of the sanction of an oath, of legal authority requiring the statement, and an opportunity for cross-examination. Where these important tests of truth are not wanting, and the testimony of the statements of the deceased witness, is on a subsequent trial, between the same parties, touching the same subject matter, and open to all the means of impeachment, and objections as to competency, which might be taken if the deceased person could be personally present as a witness, there would not appear to be any sound and satisfactory ground for its exclusion.

"This doctrine has been denied, however, all application to criminal cases, but without any good and substantial reason. The general rules of evidence, the sole object of which is the ascertainment of truth, are usually the same both in civil and in criminal cases. In the case of declarations made in extremis, indeed, even greater latitude is given in criminal, than in civil cases. And as to the testimony of the statements of a deceased witness, given on a former trial, it must be conceded, that the accused is confronted by the persons called to testify against him, on the last, as well as on the former trial. The

authorities cited, on behalf of the plaintiff in error, to except the appli-
cation of the rule from criminal cases, are not well sustained. They
consist chiefly of some of the earlier elementary writers on the law of
evidence, who have relied solely on the case of Sir John Fenwick,
5 Harg. St. Trials, 62. That was a proceeding in Parliament by bill
of attainder, on a charge for high treason. It appeared that Lady
Fenwick had spirited away a material witness, who had sworn against
one Cook, on his trial for the same treason. And the recorder having
said, that the deposition taken before the examining justice was evi-
dence against the prisoner, he having caused the witness to be spirited
away; this was treated as something novel, and it was asserted that
no lawyer would advance it who was out of his A B C. To this,
another member replied, that he thought Lord Hale was beyond his
A B C, especially in the Pleas of the Crown; and he read from his
book, that an ex parte deposition might be used against the prisoner,
when the witness was dead or withdrawn. Now, this was not the
case of a deceased witness, nor a case where there had been an oppor-
tunity for cross-examination on a former trial between the same
parties.

"A remark of Mr. Evans, in his 2d Vol. of Pothier on Contracts,
has been referred to as sustaining this exception in criminal cases; but
Mr. Evans cites no authority to sustain him. Also, the case of The
State v. Atkins, 1 Tenn. Rep., by Overton, 229, is referred to. But
this case is directly overruled in Johnson v. The State, 2 Yerger's Rep.,
58, and in the case of Kendrick v. The State, 19 Hump. Rep., 479,
in the same State.

"The case of Finn v. The Commonwealth, 5 Rand. Rep., 701, is
relied on; but the only authority cited to support this case is that of
Peak's Evidence, and that rests solely on the authority of Fenwick's
case. Besides this, in Finn's case, the statements offered were not
those of a witness since dead, but one admitted to be living, who had
removed from the State. The case, therefore, is not in point. The
decision in Finn's case was approved by the same court in 1853, in
Brogy's case, 10 Grattan's Rep., 722. This was a case where an offer
was made on behalf of the prisoner, to prove what a witness living,
but absent from the State, had sworn at a former trial. In neither of
these cases, does the principle settled bear anything like as strong
analogy to the case before us, as Hill's case, decided by the same court
in 1845, where the constitutional objection to the admission of dying
declarations was urged and overruled.

"The competency of such testimony, in criminal cases, is very
clearly sustained by the weight of authority in England. In the case
of The King v. Radburne, (1 Leach. C. C. R., 512, 3d ed.), the tes-
timony of a deceased witness, who had been examined in the presence
of the prisoner, was held admissible. The same doctrine is recognized
in Bullver's Nisi Prius, 242, and by Lord Kenyon in the case of the
King v. Joliffe, 4 Ter. Rep., 290. In Buckworth's case, adjudged in

the reign of Charles II, it was held, that to sustain an information for perjury, it was competent to prove by a witness what another witness had testified on the first trial. Sir T. Raymond's Rep., 170. To the same effect is Rex v. Smith, 2 Starkie's Rep., 186. And in the more recent case of Regina v. Beeston, (29 Eng. L. & Eq. Rep., 527); Rex v. Rowley, 1 Moody Crown Cases, 111; Rex v. Reed, M. & M., 403; and Rex v. Carpenter, 2 Shower 47.

"In the case of The United States v. Wood, 3 Wash. C. C. Rep., 440, it was held, that what a witness (since dead) had testified at a former trial on the indictment, may be proven by a person who was present and heard his testimony.

"In the case of The Commonwealth v. Richards, 18 Pick. Rep., 434, the constitutional question touching the competency of such testimony was directly presented, the words in the Bill of Rights in Massachusetts being substantially the same which are used in the Constitution of Ohio. And, after full deliberation, it was held, that the competency of such evidence was not affected by the provision in the bill of rights. This decision, which is entitled to very high consideration, is directly in point in the case before us, upon the constitutional question."

Pennsylvania holds, Commonwealth v. Cleary, 148 Pa., 26: "Where upon a subsequent trial the witness is dead, or beyond the jurisdiction of the court, there seems to be no good reason why his testimony taken upon the former trial and clearly proved, should not be admitted. In Brown v. Commonwealth, 73 Pa., 321, it appeared that on a preliminary hearing before the committing magistrate, the defendant and his counsel being present, a witness was examined whose testimony was taken down by defendant's counsel, and the witness having died before the trial, the notes of his evidence, proved by the counsel under oath, were offered in evidence, objected to and admitted. It was contended that by the Constitution of this State, the defendant was entitled to meet the witness face to face. It was held by Chief Justice Read that the testimony was admissible."

South Carolina holds, State v. DeWitt, 2 Hill, 282: "The rule that what a deceased witness has sworn on a former trial of the same case between the same parties may be received in evidence on a second trial, is a familiar one and of almost daily application."

Tennessee holds, Kendrick v. The State, 10 Hump., 479: "The attorney for the State proposed to prove on the trial what Rushing had stated before the committing court. The evidence was not in violation of the constitutional right of the defendant to meet witnesses against him, face to face, for Kendrick had met Rushing face to face before the committing court and had the right to cross-examine him." In this case the Tennessee court discusses the question at length and refers to many authorities.

Utah holds, State v. King, 24 Utah, 482: " 'Under the Constitution and statutes of the State the accused had a right to be present

at the trial, to be confronted by the witnesses against him, and to meet his accusers face to face. He also had the right to appear and defend against the accusation preferred against him in person and by counsel. He had the right not only to examine the witnesses, but to see into the face of each witness while testifying against him, and to hear the testimony given upon the stand. He had the right to see and be seen, hear and be heard, under such reasonable regulation as the law established. By our Constitution it is clearly made manifest that no man shall be tried and condemned in secret, and unheard.' The chief purpose in requiring that the accused shall be confronted with the witnesses against him is held to be to secure to the defendant an opportunity for cross-examination; so, that if the opportunity for cross-examination has been secured, the test of confrontation is accomplished. If the confrontation can be had it should be had. By taking the testimony of the witness Johnson in the presence of the accused upon the examination at a time when he had the privilege of cross-examination, this constitutional privilege is satisfied, provided the witness can not, with due diligence, be found within the State. The constitutional requirement of confrontation is not violated by dispensing with the actual presence of the witness at the trial after he has already been subjected to cross-examination by the accused, and the other requirements of the statutes have been complied with."

Vermont holds, State v. Hooker, 17 Vermont, 659: "If a hearing be had before a magistrate upon the complaint of a grand jury charging a person with the commission of a crime and before a trial is had, a witness who testified before the magistrate, dies, evidence may be received to prove what that witness testified before the magistrate."

Washington holds, State v. Cushing, 17 Wash., 544: "It is claimed the court erred in admitting the testimony given on the former trial by a deceased witness and it is urged with much earnestness on the part of counsel that the action of the court was an infringement of sec. 22 of Art. 1 of the Constitution, which provides that in criminal prosecutions the accused shall have a right to meet the witnesses face to face. In support of their contention counsel cite the case of Cline v. The State, 36 Texas Crim. Rep., 320, 36 S. W., 1099 (Tex.) No other case is cited, and it seems that the overwhelming weight of authority is to the contrary," citing numerous authorities.

Wisconsin holds, Jackson v. The State, 81 Wis., 131: "This language is quite similar to that contained in art. VI of the amendments to the Constitution of the United States. In State v. Cameron, 2 Pin., 490, Stow, C. J., said: 'The trial by jury, as it existed of old, is the trial by jury secured by our national and State Constitutions. It is not granted by these instruments; it is more,—it is secured. It is no American invention. Our fathers brought it with them to this country more than two centuries ago, and by making it a part of the Constitution they intended to perpetuate it for their posterity, and neither Legislatures nor courts have any power to infringe even the

least of its privileges.' That language is quoted approvingly by Ryan, C. J., in In Re Eldred, 46 Wis., 553.

"Thus it appears that the right of the accused to meet the witnesses face to face was not granted, but secured, by the constitutional clauses mentioned. It is the right, therefore, as it existed at common law that was thus secured. That right was subject to certain exceptions. One of these exceptions was that the declarations of a murdered person, made when he was at the point of death and every hope of this world was gone, as to the time, place, and manner in which, and the person by whom, the fatal wound was given, are admissible in evidence, notwithstanding such deceased person was not sworn nor examined, much less cross-examined. This court has frequently held that the constitutional clause quoted is no bar to the admission in evidence of such declarations. State v. Cameron, 2 Pin., 490; Miller v. State, 25 Wis., 384; State v. Martin, 30 Wis., 216; State v. Dickinson, 41 Wis., 299. In these cases it is, in effect, said that such rule as to the admission of such dying declarations was well settled before the adoption of our Constitution, and that the same was not abrogated by the clause of the Constitution quoted.

"The testimony of a deceased witness, given upon a former trial, would seem to be admissible upon the same theory. 'The chief reasons for the exclusion of hearsay evidence,' says Mr. Greenleaf, 'are the want of the sanction of an oath and of any opportunity to cross-examine the witness. But where the testimony was given under oath, in a judicial proceeding in which the adverse litigant was a party, and where he had the power to cross-examine and was legally called upon so to do, the great and ordinary test of truth being no longer wanting, the testimony so given is admitted, after the decease of the witness, in any subsequent suit between the same parties.' 1 Greenl. Ev., sec. 163. In speaking of criminal cases, Mr. Cooley says: 'If the witness was sworn before the examining magistrate, or before a coroner, and the accused had an opportunity then to cross-examine him, or if there were a former trial on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the opposite party.' Cooley Const. Lim., (6th ed.), 387, citing numerous cases. The attorney general cites numerous cases under similar constitutional provisions to the same effect."

Of the reports of all' the States to which we have had access, we find but one State that holds the testimony is inadmissible, and that is in Virginia. See the case of Brogy v. Commonwealth, reported in 10 Grattan 722. This case is not adhered to or followed in any other jurisdiction, but in many of the decisions herein cited it is criticised and shown that it was rendered upon a misconception of what was held in Lord Fenwick's case. In that case it appears that the testimony had been adduced upon the trial of another defendant, when Lord

Fenwick was not present, and for this reason only, it was rejected and in no English case or other case do we find that evidence of this character was rejected when taken on an examining trial or in a former trial in the presence of the accused. The reason given by the Virginia court was not that it was forbidden by the constitutional provision, but, as before said, upon a misconception of the rule in England. In treating of the constitutional question the Virginia court adheres to the rule announced in all the other States, that if the testimony was admissible in England at the date of the Declaration of Independence the testimony is admissible, and is not violative of the Constitution. In the case of Hill v. The Commonwealth, 2 Grat., 594, that court holds: "1. Is such evidence contrary to the bill of rights? If this question is to be answered affirmatively, then for nearly 70 years past, the courts of this Commonwealth have been in the constant practice of violating the Bill of Rights in a most important particular. We admit that the practice of the courts, however long, and uniform, is not of itself a valid answer to the objection; and that this court is bound to decide it now; not upon practice, but upon principle. How does this question stand? One of the learned counsel for the prisoner maintained, in the argument, that the provision in the Bill of Rights, that the accused had a right to be confronted with the witnesses against him, was a new principle; the offspring of American liberty; and that it had no existence in the great charter of English liberty. In this respect, we think the learned counsel is in error. Magna Charta provides that a subject accused of crime, should be tried by his peers; and according to the principles of the common law; and it is a well established principle of the common law, that an accused should be tried by a jury of the vicinage; that the trial should be public; and the witnesses against him examined in his presence. This was no new principle. It was familiar to Virginia in her colonial condition. The question then arises, what was the doctrine of the common law as it regarded this rule of evidence? Without attempting to ascertain the antiquity of the earliest decisions of the British courts affirming the rule, it is sufficient to state, that long anterior to the year 1776, the period of the declaration of the bill of rights, the rule of evidence was well established. And it is remarkable, that in all the commentaries it underwent in England, it was never supposed that the rule was a violation of the rights of the subject secured by Magna Charta."

In construing this clause of the United States Constitution, the language being the same as that contained in the Texas Constitution, the Supreme Court of the United States holds, Mattox v. United States, 156 U. S., 237, (39 Law. Ed., 411): "We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in

the nature of a bill of rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination; nor is the witness brought face to face with the accused, yet, from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice. As was said by the chief justice when this case was here upon the first writ of error, 146 U. S., 140, 152, (36; 917, 921), the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath. If such declarations are admitted, because made by a person then dead, under circumstances which give his statements the same weight under oath, there is equal if not greater reason for admitting testimony of his statements which were made under oath.

"The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of, and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven. We do not wish to be understood as expressing an opinion upon this point, but all the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes and of the testimony of the deceased witness, such as was produced in this case, is competent evidence of what he said."

This has been the unbroken rule of decisions in the Supreme Court, and the Federal courts in an early date so held. See, United States v. Malcomb, 5 McLean, 286; United States v. White, 5 Cranch, 457; United States v. Wood, 3 Wash. C. C., 440. The case cited in the Kemper case, Motes v. U. S., 178 U. S., 458, does not bear the construction placed on it in that opinion. In that opinion a witness was present when the case was called and an announcement had, but was spirited away at the instance of one of the defendants. The court holds in that case that the testimony was admissible as against the

defendant who was instrumental in securing the flight of the witness
and affirmed the case as to him, but held that it was inadmissible
against the defendants who had nothing to do with getting the witness
to flee, on the ground that it was not shown he was beyond the juris-
diction of the court, thus adhering to the rule that has always pre-
vailed in that court that this testimony can only be introduced when
the witness is dead or is beyond the jurisdiction of the court, or is
insane, or is prevented from attending court by the person on trial,
but when it is shown that either of these contingencies have occurred,
the testimony is admissible and is not in violation of any clause of the
Constitution.

We have not discussed the opinions of the courts of this State on
this question, because we are satisfied the bench and bar are familiar
with these decisions, but have gone to the courts of other States in an
effort to determine the proper construction of this provision of the
Constitution. We find that in England which is not only said to be
the mother of this country, but also the mother of the common law, we
find an unbroken line of decisions admitting this character of testi-
mony. We find the United States Supreme Court in construing a
clause of the Constitution in the same terms as our own, says the
the testimony is admissible, and gives to that provision a construction
which is adhered to by all the States in the Union in which the
question has arisen. In each and every one of these States of this
Union it has been held, when this provision was being construed, that
it must be construed in accordance with the rules of law recognized
prior to and at the time of the Declaration of American Independence
in 1776, and there are none now, we believe, but who admit that, in
that country at that time, and during our colonial days, this character
of evidence was admissible in criminal cases. This declaration in the
Bill of Rights, as said by all the writers, was no new principle of law,
but one grown up with and had become a part of the common law
of England, long prior to the existence of this Union, and while the
territory now forming the State of Texas, was a part of the Spanish
possessions. In 1836, when the citizens of Texas adopted the Declara-
tion of Independence and framed for themselves a Constitution, this
provision was inserted in exactly the same language as used in the
United States Constitution, but, as Texas, prior to that time, had
been a part of Mexico, where the common law was not the rule of
construction, it also placed in its Constitution at that time the fol-
lowing provisions: Sec. 13 of Article 4: "The Congress shall, as
early as practicable, introduce by statute, the common law of England,
with such modifications as our circumstances, in their judgment may
require; *and in all criminal cases the common law shall be the rule of
decision."*

It thus appears that when Texas first placed in her Constitution the
provision that the "accused shall be confronted with the witnesses
against him," in that same instrument and at the same time placed

therein the clause "in all criminal cases the common law shall be the rule of decision." All admit, and the decisions of all ˙the English Courts declare, that this character of evidence was admissible when the witness is dead, beyond the jurisdiction of ˙the court, is insane, or is kept away by the connivance of the accused, by the common law. Not only was the common law made the rule of decision by the Constitution of the Republic of Texas, but when it was admitted ˙to the Union, we find the Supreme Court of this State in the case of Grinder v. The State, 2 Texas, 339, saying: "The common law in criminal cases not provided for by legislative enactment, was introduced by the Constitution of the Republic, and is still the law." Mr. Justice Lipscomb, who wrote the opinion in this case, was a member of the Constitutional Convention that framed ˙the Constitution of the State of Texas, ˙as was also Mr. Hemphill, who was at that time chief justice of the Supreme Court. And in the case of Burrell v. The State, 18 Tex., 713, while Messrs. Hemphill and Lipscomb were still members of ˙the court, in speaking of admitting dying declarations, the court says: "It has been uniformly held that the admission of this evidence does not infringe the constitutional right of the accused to be confronted by the witness against him."

This is the first instance where we find this provision of the Constitution construed by the courts of this State, and when we consider that this construction was placed thereon by the men who helped to frame it, it seems to us conclusive. Not only was this construction placed on that provision ˙as regards ˙dying declarations, but the first time the question arose as to whether the testimony of witnesses who had since died or gone beyond the jurisdiction of the court, ˙the same construction of this clause of the Constitution was given thereto, and this rule of decision was adhered to in an unbroken line of decisions from the ˙day that Texans threw off the yoke of Mexico for more than half a century. The first time it was ever questioned was in the year 1896, when by ˙a divided court the decision in the Marshall Cline case was handed down. When we take into consideration that the citizenship of Texas, at the time of the birth of the Republic and later when it was admitted to the Union was composed principally of immigrants from the States of Alabama, Georgia, Mississippi, Louisiana, Tennessee, Missouri, Arkansas, Kentucky and the two Carolinas, and that courts of last resort in all those States have held and now hold that admitting this character of evidence when the witness is dead, is not in violation of this provision of the Constitution, it would indeed be strange, for us now to engraft thereon a different construction.

All other States in this Union where this question has been raised, and the Supreme Court of the United States, have held that admitting this character of testimony is not violative of this clause of the Constitution. ˙We have given this question much thought, have

devoted considerable time to reading the text-books and decisions of the various courts on this question, and we conclude, as expressed in some of the opinions quoted, that the American common law was and is the law as it existed in England at the time of the Declaration of Independence; that this was not and is not a new declaration of right, but it was a part and parcel of the English law of that period, and in adopting it in this country, we adopted it with the construction that had theretofore been placed thereon; and the case of Kemper v. State, 63 Tex. Crim. Rep., 1, 138 S. W., 1025, is overruled on this point; and Cline v. The State, 36 Tex. Crim. Rep., 320, and all cases following it are again overruled, and the law in this State is declared to be that when the testimony of a witness has been taken in the course of a judicial proceeding, and the accused had the opportunity to cross-examine him then, and the witness dies, or becomes insane, or moves beyond the jurisdiction of the courts of this State, or is kept away by the wrongful acts of the person accused with crime, in a subsequent trial, the testimony of such a witness can be introduced in evidence.

Judgment affirmed.

*Affirmed.*

Davidson, Presiding Judge, absent.

[Rehearing denied January 10, 1912.—Reporter.]

DAVIDSON, Presiding Judge, (*dissenting*).—The judgment was affirmed while I was absent, at the present term of the court. Appellant filed a motion for rehearing and asked a reconsideration of the questions decided in the opinion of affirmance upon the theory that there was serious error committed on the trial of the case in the court below as well by this court in its opinion affirming the judgment. This motion for rehearing is overruled without written opinion and the affirmance made final. I dissent and adopt as the reasoning for my dissent the ably written brief of appellant's counsel, Messrs. A. S. Fisher, Marsene Johnson, Elmo Johnson and Roy Johnson, which is as follows:

"At a former day of the present term, this case was affirmed. Appellant filed his motion for rehearing within the statutory time.

"Questions not passed on. On the trial of the case in the court below, in appellant's motion for new trial, in his assignments of error and in his original brief, appellant strenuously protested and objected not only to the reproduction by the State of the testimony of the dead and absent witnesses named in the record, but to the *manner* in which said testimony was reproduced. We submit that a careful inspection of the opinion affirming this case will sustain the contention of our motion for rehearing that these questions, especially as to the *manner* of reproducing the testimony, were not carefully considered.

"Your Honors will remember that the record discloses the fact that the district attorney was permitted to read from the agreed statement

of facts of the first trial and appeal, (reported in 54 Texas Cr. Rep., 21) all the testimony contained in said statement given by the defendant at the first trial; and not only that, but to read the testimony of police officers who testified at the former trial, and who were present at the second trial, but not put on the stand at the last trial. This very testimony was by this court on the former appeal held inadmissible because coerced from defendant while under arrest. (See former appeal, 54 Texas Cr. Rep., p. 21.)

"These matters will forcefully show to your Honors the necessity for the rule laid down by this court in its very last expression as to the correct way in which testimony *must* be reproduced (if at all) and that is, 'that this character of testimony could not be reproduced by merely reading from an agreed statement of facts of a former trial. Under such circumstances, when reproduction of testimony is permissible a witness who heard the former evidence, if it is oral testimony, should be introduced to show what the witness' evidence was on the former trial." (See Hardin's case, 57 Texas Cr. Rep., at page 40.)

We earnestly insist, that whether this court reaffirms the doctrine that testimony of dead and absent witnesses can be reproduced on subsequent trials, or again declares as in the Cline and Kemper cases that reproduction of testimony is not warranted nor permissible under the Constitution and laws of Texas, this case must be reversed because the record shows that the State was permitted by the lower court, over the objections and protests of defendant, to reproduce the testimony given at a former trial by present living witntsses who were not put upon the stand by the State or defendant at the last trial.

Surely, this court will carefully reconsider this case on this question *alone,* even though our following propositions may not meet the approval of this court.

We come now to the matter with which almost alone the opinion of affirmance deals; and that is, generally, as to reproduction of testimony. The vice of the opinion rendered in the case as to reproduction of testimony, is in holding:

First. "That section 13, article 4, of the Constitution of the Republic of Texas is, as a constitutional provision, still in force in this State, independent of subsequent statutory provision relating to the common law."

Second. "That when Texas adopted the common law it also adopted the English statutes, up to a certain period, as the American common law."

Our *contra* propositions are:

First. That the Constitution of 1836 of the Republic was completely abrogated by the adoption of the Constitution of 1845 of the State of Texas and that none of its provisions, except those enacted into statute or readopted by the subsequent Constitution of 1845, remained the law of this State.

Second. That neither the Republic, nor State of Texas, by any Act, constitutional or statutory, ever adopted an English statute by its adoption of the common law.

The first proposition answers itself. The Constitution of 1836 was not that of a State only, as we of the different States of the Union understand the term, but that of a State in its broadest meaning, viz.: An independent sovereignty. A nation within itself. Under that Constitution, Texas had the power to regulate commerce, coin money, regulate the value thereof and foreign coin, to establish postoffices and post roads, grant patents and copyrights, to declare war, grant letters of marque and reprisal and to regulate captures, to provide and maintain an army and navy and to make all laws and regulations necessary for their government, etc. Does this court propose to hold that such powers were carried over to the State of Texas? To hold that any one provision of this Constitution, not carried forward into the Constitution of 1845, remained in force, this court would be compelled also to hold that provisions of the Constitution of 1845, 1866 and 1869, though not carried forward into the different succeeding Constitutions, are still the law, though we are now supposed to be administering this State government under the Constitution of 1876.

The Constitution of 1869, section 10, article 1, says: "The privilege of the writ of habeas corpus shall not be suspended, except by Act of the Legislature," etc.

Section 12, article 1, of the Constitution of the State of Texas of 1876, says: "The writ of habeas corpus is a writ of right, and shall never be suspended."

If both Constitutions are in effect, which one of these provisions control? If they are both in effect, you must so construe the law, if possible, as to make both stand and reconcile the conflict. This you would not attempt to do. And why? Because this court would not place itself in a position, so absurd, as to call forth the criticism of every lawyer and court in the land. The elementary rule is that when a new Constitution is adopted, the former is abrogated. True, portions of the former Constitution may be expressly adopted and carried forward into the new, but the old Constitution is a thing of the past. "When the people, in the exercise of their sovereignty, deliberately put an end to the existing Constitution, and adopt an entirely new one instead, all powers of government under the old Constitution necessarily cease, except in so far as they are maintained in existence in the new Constitution." Seger v. Crenshaw, 8 La. Ann., 401.

Judge Harper in his former opinion has evidently been misled by an awkward expression of Justice Lipscomb in the Grinder case, 2 Texas, 340. The language used is this: "The common law in criminal cases, *not* provided for by legislative enactment, was introduced by the Constitution of the Republic *and is still the law.*" (The italics are ours.) This opinion was written in 1847, nearly two years after the adoption of the Constitution of 1845 and about seven years after the

Act of January 20, 1840, adopting the common law as the "rule of decision" in this State.

It was not the purpose of Judge Lipscomb, by that language, to hold that the Constitution of 1836, or any of its provisions, not carried over into the Constitution of 1845, was in force after the adoption of the Constitution of 1845. He did not so hold in the Grinder case. The Act of 1840, at the time of the rendering of said opinion had been passed, adopting the common law as "the rule of decisions" in obedience to sec. 13, art. 4, of the Constitution of 1836.

Our conclusion is strengthened by reference to the case of Republic of Texas v. Smith, Dallam's Reports, p. 410, which not only reviews the constitutional provision referred to, but several statutes "provided by legislative enactment." The court says: "We frankly admit that we search in vain in the common law for an instance of an appellate court retrying the cause upon the facts; and we know that the only mode known to the common law of removing a cause from an inferior to a superior tribunal was by writ of error. But we can not admit that in adopting the common law the convention intended thereby to adopt irrevocably the practice of the common law in criminal proceedings, and tie down the legislature of the country to the common law course of proceedings. For we see that the very framers of the Constitution itself after adopting the "common law as the rule of decision in criminal proceedings," have gone on and made considerable innovations in the practice of that very code which they had just adopted. At common law, in criminal cases, the defendant had not the right to have compulsory process to compel the attendance of witnesses, etc. He had not the right to be heard by counsel, except upon collateral or incidental questions; he had not the right of the writ of habeas corpus; nor did he, indeed, have the right of the benefit of testimony in his favor under the sanction of an oath; all of which is secured to the citizen by our constitution and are innovations in the practice of the common law. It is our opinion, then that the convention intended only to adopt the common law, to use their own language, "as the rule of decision" in criminal proceedings; and no more of the forms and peculiar writs of that code than might be found necessary to carry out the objects contemplated by that adoption." It is hardly to be presumed that one of Justice Lipscomb's learning and ability would state, in the face of the opinion in Republic v. Smith, and the fact that he was thoroughly familiar with the statutory laws of the Republic, that the common law had not been provided by legislative Act of 20th January, 1840; and it would be still more improbable that he, knowing that the Constitution of 1836 had been abrogated and superseded by the Constitution of 1845, and that sec. 13, art. 4, of the Constitution of 1836 had not been carried over into the Constitution of 1845, would have said that said section of the Constitution of 1836 was still in force. He was only holding that

where there was no legislative enactment on the subject, the rule at common law should be the rule of decision in criminal law.

Now, as to the second proposition, viz.: "That neither the Republic nor State of Texas, by an Act, constitutional or statutory, ever adopted an English statute by its adoption of the common law."

To properly appreciate and understand this question, it is necessary to briefly review the legislative history of the States now forming the United States.

1st. The thirteen original colonies and the States formed from territory ceded by those different colonies and from which territory other States were subsequently formed. 2nd. That afterwards acquired and known as the Louisiana purchase. 3rd. That purchased of Spain and known as the Florida purchase, and 4th. Texas, and that acquired of Mexico by the treaty of Guadalupe Hidalgo and under the Gadsden purchase.

Now as to the first, the thirteen original colonies and the territory subsequently ceded to the United States,—such, for instance, as the Northwest territory, etc.—the common law, as well as English statutes of a general nature prevailed up to the 4th day of July, 1776, the date of the final separation from England. Up to that time all of such territory was a part of the British Kingdom over which the laws of England, both common and statutory, obtained. No legislation by any of the thirteen original colonies was necessary to put such law in force. It was in force by their relation to the Crown of England and so remained until repealed, modified or amended after their separation July 4th, 1776. This in effect is the opinion in Patterson v. Winnie, 5 Peters, 232, which was an appeal from Georgia, one of the thirteen original colonies. The court, through Justice Storey, was then speaking as to the effect of the common law and the English statutes applicable to Georgia and the other original colonies. Also the cases of Tayloe v. Thompson, 5 Peters, 358, and Cathcart v. Robinson, 30 U. S. (5 Peters), 264, both of which originated in the District of Columbia, which had formerly been a part of two of the original colonies. No question whatever is made as to the correctness of those opinions, nor to the correctness of the many opinions copied by this court into its opinion and cited from the Am. & Eng. Ency. of Law to sustain the text of such encyclopedia as follows: "It may be stated as a general rule that English statutes passed before the emigration of our ancestors, in aid or amendment of the common law, applicable to our condition and not repugnant to our institutions and form of government, constitute a part of our common law." But we do most emphatically deny that either English common law or English statutes ever had any effect in either French, Spanish or Mexican territory which was never under the jurisdiction of English rule or within English territory, except by some Act of adopton; this regardless of any question of emigration by our ancestors or any one else. It is true that the particular character of emigration may have caused the adoption of the common

law, but the mere fact of such emigration alone, without such adoption, most certainly did not put into effect either the English common law or the English statutes. *Adoption and emigration are not synonymous.*

As to the territory acquired from France, Spain and Mexico, neither the common law nor English statutes were in force, but over all such the civil law prevailed, while under the sovereignty of France, Spain or Mexico. The same as to Texas; and not until the common law was adopted by the different States formed from such territory did it have any force or effect in any of such teritory. However, with the exception of Louisiana, all of the different States formed from such territory have in some form or other adopted the common law. Some of these States, in adopting the common law, have adopted as a part of such the English statutes up to certain periods. So have also a number of the States formerly composing the thirteen original colonies and States formed from the territory ceded by them or part of them to the United States and over which, as before said, the common law and English statutes up to a certain period prevailed.

Arkansas adopted the common law and English statutes up to the fourth year of James the First. So did Colorado, Illinois, Indiana, Missouri, Wyoming and Virginia; Florida up to July 4th, 1776, so did Connecticut and Rhode Island; Georgia up to the 14th of May, 1776, and this also applies to Alabama and Mississippi, both being formerly a part of Georgia. Kentucky, by its first Constitution adopted "all laws now in force (19th of April, 1792) in the State of Virginia," which fixed the fourth year of James the First as the period to which English statutes are adopted; Pennsylvania up to May 14th, 1776, while most of the other States have adopted the common law, some as to rule of decision, some qualifying and others not. Texas adopted the common law pure and simple on the 20th day of January, 1840, as follows:

"The common law of England (so far as it is not inconsistent with the Constitution and laws of this State) shall, together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature. Revised Civil Statutes, art. 3258." It will be observed nothing is there said about adopting any English statute, but only the common law of England; and then only so much of it as is not inconsistent with the statute or constitutional law of this State.

The opinion rendered in this case by Judge Harper is the first ever rendered holding that, by the adoption of the common law of England, Texas also adopted the English statute, and refers to a great many cases *outside of Texas* to show what is the "American common law." Our reply to that is, Texas has never adopted the "American common law" and in the very nature of things, can not, without fixing, by statute, some period when the English common law ends and the "American common law" begins. What date will this court fix as the

beginning of the "American common law" spoken of in Judge Harper's opinion? Will it be the fourth year of James the First, or the 4th day of July, 1776, or the 14th day of May, 1776, or will it adopt all of the English statutes up to 1836, the date of Declaration of Independence by Texas? The correct rule is that announced by our "higher courts" in an unbroken line of decisions, viz.: that "in adopting the common law, Texas did not adopt *any* English statutes."

In Paul v. Ball, 32 Texas, 10, it is said: "It is a singular fact, that, although this State has adopted the common law by express legislative enactment, yet, unlike most, if not all of the States which have adopted the common law, we have not, as they have, also adopted all English statutes of a general nature, up to a particular period, not repugnant to or inconsistent with the Constitution and laws of the State. Hence our rules of construction and interpretation must be predicated upon the common law, upon our statutes, and upon the general policy embodied in our varied form of government. It would be dangerous, as we think, to submit too implicitly to rules of construction founded entirely upon English jurisprudence."

And in Courand v. Vollmer, 31 Texas, 397, 400, it is said: "The common law of England (so far as it is not inconsistent with the Constitution or the acts of Congress now in force) shall be the rule of decision in this Republic, and shall continue in force until altered or repealed by Congress.' (Paschal's Dig., Art. 978, note 418.)

"It is perfectly apparent that the whole system of the common law of England was not adopted by this act, but simply that portion of it which related to 'the rule of decision.' The substratum of the law of the parent country was the civil law. This, together with the statutes in force in Mexico and in Coahuila and Texas on the 2nd of March, 1836, were the laws in force when Texas became a separate government, and remained such until repealed. The Constitution of 1836 and the acts of three different Congresses had already furnished a collection of laws sufficient for a superstructure, but the basis or foundation of the judicial system was the civil law, and it was this which formed the rule of decision up to January, 1840.

"This act, therefore, substituted the common law of England in place of the civil law as "the rule of decisions," and for this only. It did not adopt the common law of England as a rule of practice, or to be used except when something was to be decided. This, of course contemplated judicial decisions, and was intended for the direction of the judiciary to resort to the unwritten law of England in those cases where the statutes are silent. Unlike most of the other States of the United States, the State of Texas, or the territory of which it is composed, never was under the jurisdiction of England, and therefore none of the English statutes ever were in force in this State except as they have been specially enacted. The Congress of the Republic of Texas and the Legislature of the State of Texas have adopted as laws a por-

tion of an Act of 13 and 27 Elizabeth, and one section of an Act of 29 Charles II, and the whole unwritten or ante-statute law of England, so far as it forms or can form, in the absence of statute law, "a rule of decision." And it would be just as improper to say that, because the Legislature enacted the 4th section of the statute of frauds, the whole act was adopted, as to say that the common law of England was adopted for any and all purposes, because it was adopted as a "rule of decision."

"We have thus far proceeded as if the act introduced the common law as a rule of decision without exception. But the act itself expressly excepts even this when it is inconsistent with the Constitution or laws in force. When, therefore, such a state of things exists by the laws in force as would cause an inconsistency, or a want of necessity to resort to the common law, it is not in force."

Then again in the Indorsement Case, 31 Texas, 697, it is said:

"What is meant by 'the rule of decision,' we do not pretend to say, and we have cited the act (Arts. 804, 978) for the purpose of calling attention to the fact, that in the adjudication of causes the ante-statute law of England forms the substratum, and the Constitution and laws of the United States, together with the Constitution and laws of this State, the superstructure of our system of jurisprudence. The laws, statutes, and customs of any country, State or nation, with the above exception, can have no force or validity as such. The laws, rules, or regulations relative to bills of exchange, promissory notes, etc., in force in this State, are our own statutes on this subject, inasmuch as by the common law of England a chose in action was not assignable. (Storey on Bills, sec. 17.) What is known as the mercantile law, and which accompanied the emigrants of Europe to this continent as a part of their inheritance, and which is now acted upon and received with the same binding force as a statute in most of the United States, has no validity or force in this State, except so far as it has become statute law, because it was so declared by the thorough sweeping act above recited. (Art. 804)."

In the case of Leeper v. State, 29 Texas Crim. App., 63, Judge Willson, one of the ablest judges who ever graced the higher courts of this State, in condemning the practice of judges referring to decisions of other States and in their endeavor to engraft upon the laws of Texas, by judicial construction, the laws of other countries and States, says: "We shall not enter upon an investigation and review of authorities, for whatever may be the common law rules, or the rule established by the decision of other States, we consider that in the decision of this question, we must be controlled by our statutes.

"In this State for more than thirty years we have had a Penal Code and a Code of Criminal Procedure, which having been carefully prepared by distinguished, experienced, and able jurists, were adopted by the Legislature. These codes have been pronounced by the bench and bar of our State to be the most perfect system of criminal laws ever

devised. It is declared to be the design of the Penal Code "to define in plain language every offense against the laws of this State and affix to each offense its proper punishment." Penal Code, art. 1. It is declared that the Code of Criminal Procedure "is intended to embrace the rules applicable to the prevention and prosecution of offenses against the laws of this State, and to make rules of proceeding in respect to the prevention and punishment of offenses intelligible to the officers who are to act under them, and to all persons whose rights are to be affected by them." Code Crim. Proc., art. 1.

"We regard it as the imperative duty of this court, and of all other courts of this State, in the trial and determination of causes, to be guided and controlled by the statutes of the State, whenever there is a statute applicable to the question presented. Our observation is that many errors have crept into the decisions of the courts of this State, especially in criminal cases, by following common law rules and decisions of other States, overlooking our own statutes. These errors should be corrected whenever detected, and a strict adherence to statutes should be the rule governing courts in their decisions."

This court will search in vain for any rules of common law which will sanction the reproduction of the testimony of witnesses who have, since testifying, died, or departed the jurisdiction of the court. True the common law as understood and practiced in a great many of the States of this Union does sanction, because in most of them they have not only adopted the common law *per se,* but English statutes, which, by legislative enactment, they have virtually made a part of the common law. But Texas certainly can not be controlled in its policies of government by the enactment of other States nor by these decisions in construing the effect of those statutes so foreign to our system.

It is not denied that Parliament, untrammeled as we are by a written Constitution, had the power to enact the 10th and 13th chapters of the 1st and 2nd and 3rd Philip and Mary, nor that of Henry (we do not remember year or chapter) to aid which the statute of Philip and Mary was enacted. Parliament is generally said to be omnipotent as to the enactment of laws, but where is the judge in this land who will claim such power in behalf of State Legislatures? Here powers of government are conferred and each department of government is limited in its power. This is a government of delegated powers. Here the people are the source of all power. They speak their will through Constitutions and the same power that frames and adopts a Constitution can abrogate it in whole or in part. Does this court deny this proposition? When the people of Texas in 1836, wrote sec. 13, art. 4, into their Constitution, there was an implied reserved right and power in them to change, alter, amend or reject not only sec. 13, art. 4, but every other section of that Constitution by adopting another Constitution and by changing its form of government. This they did and descended from an independent sovereignty, which had been recognized by some of the great powers of the world as such, to that of a State

of the United States. Does this court deny that it had such power?
Yet Judge Harper seems to convey the idea, if we have read his opin-
ion correctly, that Texas once, by its Constitution, having adopted the
common law, was forever thereafter powerless to abrogate it, or to in
any way modify it. We are led to the above remarks because the Act
of the 20th of January, 1840, is very different in language from the
13th sec., art. 4 of the Constitution of 1836. This section is as fol-
lows: "The Congress shall as early as practicable, introduce by statute
the common law of England, with such modification *as our circum-
stances* in their judgment, may require; and in all criminal cases the
common law shall be the rule of decision." (Italics ours.)

The Act of January 20, 1840, says nothing about *"as our circum-
stances may require."* The Congress of the Republic of Texas was not
willing to have this question open to construction and to allow the
question of *necessity* to creep in. It therefore enacted that "the com-
mon law of England (*so far as it is not inconsistent with the Constitu-
tion and laws of this State*) shall, together with such Constitution and
laws, be the rule of decision and shall continue in force until altered
or repealed by the Legislature." (Italics ours).

What laws? The statutory laws of England up to the 4th of July,
1776, or to any other period? No; the laws of this State. There is
nowhere to be found in any of our legislative acts from 1836 to the
present, where any English statute has been adopted. True, a great
many of our statutes have to a certain extent, been assimilated to some
of the English statutes, but no English statute as such has ever been
adopted as in most of the States of the Union. It is unnecessary for
us to refer to English or American cases, to show, that in England and
a great many of the American States, since the statutes of Philip and
Mary, the testimony of a dead or absent witness who had formerly tes-
tified, may or may not testify against an accused. That law is in
force in England; and the courts of the different States have the
power, by construction under the different acts of adoption of the
English *statutes* to say whether such acts are, or are not in force in
such States.

It is a matter with which we have nothing to do. Those statutes
are not and never were in force in this State.

Texas in 1856 adopted a Penal Code and Code of Criminal Pro-
cedure—one of the best ever framed. In that Code of Criminal Pro-
cedure, provision is fully made for the reproduction of testimony of
witnesses who have testified and since died or gone beyond the juris-
diction of the courts of this State.

Art. 4, Penal Code, reads: "The principle of the common law shall
be the rule of construction, when not in conflict with the Penal Code
or Code of Criminal Procedure, or with some other written statute of
the State." Again, art. 3: "In order that the system of penal law
in force in this State may be complete within itself and that no system
of foreign laws, written or unwritten, may be appealed to, it is de-

clared, etc." The two statutes construed together means that the common law construction in a modified way is adopted and that all other laws except those of the State of Texas are excluded. Art. 24, Code Criminal Procedure, reads: "The defendant, upon trial shall be confronted with the witnesses, except in certain cases provided for in this Code, when depositions have been taken."

Now eliminate this statute and chapter 8, title 8, of the Code of Criminal Procedure and there is no law in this State which permits the reproduction of testimony in criminal cases. We have not adopted the statutes of England, nor the American common law (so called). There is nothing in the common law, as adopted by Texas, which permits the reproduction of testimony by witnesses who have testified but have since died or gone beyond the jurisdiction of the court. Then upon what ground will you admit such testimony? Will it be upon the ground of necessity alone? We will speak of necessity later on. Texas has never yet framed its laws that necessity can take the place of a positive legislative enactment or constitutional guarantee. Art. 763, Code Crim. Procedure, says: "The rules of evidence known to the common law of England both in civil and criminal cases shall govern in the trial of criminal actions in this State, except when they are in conflict with the provisions of this Code or some statute of the State." Nothing is said therein about the English statutes, the American common law, or the law of necessity.

There is nothing in chapter 8, title 8, Code Criminal Procedure, which authorizes the State to take the deposition of a witness in a criminal case. The State is permitted to use such deposition under certain restrictions *when they have been taken*.

Art. 812, Code Criminal Procedure, reads: "Depositions taken in criminal actions shall not be read, unless oath be made that the witness resides out of the State; or that since his deposition was taken the witness has died; or that he has removed beyond the limits of the State; or that he has been prevented from attending the court through the act or agency of the defendant; or by the act or agency of any person whose object was to deprive the defendant of the benefit of the testimony; or that by reason of age or bodily infirmity such witness can not attend." (O. C., 779).

Art. 813, Code of Criminal Procedure, reads: "When the deposition is sought to be used by the State, the oath prescribed in the preceding article may be made by the district or county attorney, or any other credible person, and when sought to be used by the defendant the oath shall be made by him in person." (O. C. 780).

Art. 814, Code of Criminal Procedure, reads: "The deposition of a witness taken before an examining court or a jury of inquest and reduced to writing, and certified according to law, in cases where the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, may be read in

evidence as is provided in the two preceding articles for the reading in evidence of deposition."

What is the condition upon which such depositions may be read by the State? It is found in Art. 797, Code Criminal Procedure, and the above articles. Article 797 reads: "When an examination takes place in a criminal action before a magistrate, the defendant may have the deposition of any witness taken by any officer or officers hereafter named in this chapter; but the State or person prosecuting shall have the right to cross-examine the witnesses, *and the defendant shall not use the deposition for any purpose unless he first consent that the entire evidence or statement of the witness may be used against him by the State on the trial of the case."* (O. C. 764). (Italics ours).

Depositions were unknown to the common law. The manner and form of taking and using is purely statutory. Therefore the common law can not in any way be looked to upon that subject. The courts of this State have always held that unless the deposition is taken and returned in conformity with the statutes of this State, they cannot be used.

In Johnson v. The State, 27 Texas, 765, Justice Moore says: "There was manifestly no error in the refusal of the court to admit the deposition of the witness, Henderson, in evidence to the jury. Depositions in criminal cases were unknown to the common law. They can only be received in our courts now, upon the conditions and with the restrictions prescribed by the Code of Criminal Procedure. Tested by it, the deposition was wholly and totally inadmissible. The consent of the district attorney, that it should be taken as was done, to be used upon the final trial, as stated in the bill of exceptions, could not abrogate or supply the requirements of the Code, or give it effect as an instrument of evidence where it can not be so held by the law, without the aid of such agreement. (C. C. P., arts. 764, 780)."

There are two preliminary conditions to the use of depositions prescribed by art. 797, 812 and 813, Code Criminal Proc., viz.: 1st. The defendant shall not use the deposition for any purpose unless he first consent that the entire evidence or statement of the witness may be used against him by the State on the trial of the case.

2d. That deposition shall not be used unless oath be made, etc., and if sought to be used by the State, the oath must be made by the district or county attorney or any other credible person and if sought to be used by the defendant then the oath must be made by him in person.

True depositions can not be read at all (except by consent) where the witness is present at the time of the trial. Art. 814, Code Crim. Proc. We do not have to look to the common law or the statutes of England or the "American common law" (so called) to determine the reproduction of testimony. Why? Because the above articles of the Code referred to have prescribed fully how and when and when not, such testimony can be used. Why all of the statutory restrictions?

Why require the consent of the defendant to the use by the State of such testimony? Why did not the Legislature of Texas adopt the English statutes and English decisions construing such statutes upon the reproduction of testimony?

The answer is plain. First, when Texas adopted the common law, it expressly provided by the Act of 1840, that no part of the common law inconsistent with the Constitution and laws of this State should prevail. And by art. 763, Code Crim. Proc., that the rules of the common law should not prevail when in conflict with the provisions of this Code or some statute of the State. It must be kept in view that both of these are legislative acts and that the same power of the Legislature to enact the statute existed in the Legislature to limit or qualify the effect or operation of the common law, and therefore our law expressly provides that both the Constitution and statutes are paramount to the common law. This statute and art. 24, Code Criminal Procedure, were so enacted as to harmonize and not conflict with sec. 10, art. 1 (Bill of Rights), of the State Constitution, every word of which is a guaranty of individual right and a limitation of the power of all departments of government. In fact it is excepted out of the general powers of government. It reads as follows:

"In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel or both; shall be confronted with the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor. And no person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary, in cases of inpeachment, and in cases arising in the army or navy, or in the militia, when in actual service in time of war or public danger."

The legislative department of government therefore, when adopting the common law was careful not to adopt anything, either of the common law or of any of the English statutes or any other law, which would in any way, by construction or otherwise conflict with this section of the bill of rights. Hence when it provided for depositions to be taken, knowing that the defendant had been guaranteed the right to be confronted with the witness against him, it was careful to place in the law, authorizing the taking of depositions, that such depositions should never be used by the State without the consent of the defendant, and that the defendant himself, should not use such depositions, unless he first consented to let them be used also by the State. If the defendant consented or in other words waived his right to be confronted by the witness against him, there would be no violation of his constitutional right. Now, so far, we have treated of testimony taken by depo-

sition preliminary to the trial of the defendant. It was never contemplated by the legislative department of the Texas government that upon trial of a defendant the second time, that the testimony of a witness who had testified on the former trial, but since died or departed the jurisdiction of the court, could be reproduced upon the second trial of such defendant, without his consent.

"The defendant upon *a trial* shall be confronted with the witness against him." Art. 24, Code Crim. Proc. There is but one exception to this provision by the Legislature, viz.: *"except in certain cases provided for in this Code, when depositions have been taken."* Art. 24, Code. Crim. Proc. (Italics ours.)

The rule of construction of statutes is this, that when a statute contains an exception, such exception limits the statute thereto and it can not be so enlarged or extended as to embrace any other exception not contained therein. Will this court deny this rule of construction?

It is not said that in art. 24, by way of an exception, that testimony may be reproduced under the rules of the common law for the reproduction of testimony, nor under the statutes of England or the "American common law." The only exception provided for is "except in certain cases provided for in this Code." The Legislature did not stop here; it was unwilling to leave the words "provided for in this Code" to construction, but went further and limited *"certain cases provided for in this Code"* to *"depositions when taken."* The Legislature knew when it enacted art. 24 that there were English statutes providing for the reproduction of testimony and that testimony could not be reproduced under the common law of England (not the "American common law").

If it was therefore the intention of the Legislature to permit the reproduction of testimony under the English statutes, why the exception confining the reproduction of testimony to "depositions provided for in this Code?" The doctrine of *expressio unius exclusio est alterius* applies.

The learned men,—and they were great lawyers—who prepared the Code of 1856 and the Legislature who adopted it, certainly did not intend that testimony should be reproduced under any common law rule. For two reasons,—1st. They did not intend that a constitutional right guaranteed by the Constitution to a defendant should be treated as a *shuttlecock* to be knocked about by any rule of construction. 2d. They knew there was no *"English common law"* rule for the reproduction of testimony in a criminal case. They knew the only rule was to be found in English statutes.

How could there be a common law rule for the reproduction of testimony? At common law, in criminal cases, the defendant had not the right to have compulsory process to compel the attendance of witnesses. He had not the right to be heard by counsel, except upon collateral or incidental questions. He had not the right to cross-examine

witnesses upon material matters; this was exercised for him, if at all, by the prosecution, nor did he have the benefit of testimony in his favor under the sanction of an oath. The office of justice of the peace, whose duty it was to examine, was created by statute; and under the statute, not common law, it required in felony cases, more than one justice. How, then can it be said that testimony could be reproduced at common law? The courts of England and the American courts when permitting the reproduction of testimony under English statutes, does so upon the ground that the defendant has once been confronted by the witnesses against him *and had the opportunity to cross-examine.* If so, what becomes of any pretended common law rule as to reproduction? With all respect to this court we submit that it will not find any well authenticated case of respectable authority which holds that the right to reproduce testimony was a common law rule; upon the contrary so strict was the common law that testimony could not be reproduced in civil cases.

You may find loose expression in some of the books about the common law rule, but if so, it is used without discriminating between the "common law" proper and the English statutes.

Does this court propose, in the face of sec. 10, of the bill of rights and art. 24 of the Code of Criminal Procedure to place the right of the State to reproduce testimony upon the ground of *necessity?* If so, where is your legal warrant for such holding? The very purpose of the bill of rights is to prevent such a usurpation of power. The bill of rights was not made for the protection of the State and to enlarge its governmental powers in any of its departments. It was made as a limitation of such power and excepted out of the general powers of government, Constitution 1876, art. 1, sec. 29. The bill of rights are individual guarantees of the citizen and are put into our Constitution to prevent courts and all other departments of government from doing, under the plea of necessity,—that specious plea of tyranny and despotism,—that which the Constitution and their oaths of office say they shall not do. Madam Roland, while upon the scaffold, in the anguish of her soul, said: "Oh! Liberty, what crimes are committed in thy name." And we, like she, can say: "Oh! Necessity, what crimes are committed in thy name." It is the most monstrous, dangerous doctrine that ever found lodgment in the head of a judge holding a constitutional office under the Constitution and laws of a free people. It is the recourse of depotism and tyranny and is never used except in an effort to violate some law when no other reason can be given. It is but a pretext for the exercise of legislative power resorted to by a judicial officer, and is but a shadowy effort to blend those powers by one of the coordinate departments of government, which the Constitution says shall not be united. It was necessity that prompted Pontius Pilate to appease the cry of the howling Jewish mob to murder the innocent Christ and send Him to His death upon the cross, and it was necessity that made the same Pilate play the craven before the Roman

Senate when called to account for his cowardly conduct. It was necessity that caused Jefferies, puppet of an infamous King, to disgrace the laws of his country and blacken English jurisprudence by the horrible butcheries perpetrated at the behest of a royal master. It may be well to remember that the only monument erected to his memory is the infamy of his judicial career.

It was "necessity" that murdered the great Raleigh by the reproduction of the testimony of living witnesses. The courts of England, whose judges, with one or two exceptions, have rarely bowed to despotism and loaned themselves as tools to accomplish a political end, would not tolerate such testimony. And "necessity," therefore, without sanction of law organized its commission and destroyed Sir Walter Raleigh. It was "necessity" that broke the neck of Sir John Fenwick. He could not be convicted before the courts of England because testimony could not be reproduced, and Parliament, to *please the Crown,* by a bill of attainder, which enabled it to violate every rule of evidence, convicted him. This was the last conviction had in England by such a procedure. The English, though believing Fenwick guilty, have never been willing to again thus prostitute their laws. It was "necessity" that inaugurated the Lettres de Cachet of France which were one of the causes that produced the reign of terror and established a rule of anarchy. It was "necessity" that arrested, without warrant of law from 1861 to 1865, hundreds of the citizens of the United States and placed them behind iron bars without knowing the "nature of the accusation against them" and whose only warrant for arrest was the tinkle of a little bell in the hands of a United States Secretary.

It was "necessity" that created military commissions at a time when the courts of the country were open, and without form of law murdered an old woman (Mrs. Surratt) on suspicion and hung her without due process of law. It was "necessity" that passed the reconstruction laws, made the order of a military officer the law in States, superseded State Constitutions, destroyed the right to the writ of habeas corpus, denied the right of trial by jury and arrested and imprisoned the citizen without informing him as to the "nature of the accusation against him" and placed over sovereign States a destroying blight, in the shape of negro rule, for years more terrible in its effect than the sword of the destroying angel to Egypt's first born. You may say that these times are different, but bear in mind that your action will become a precedent, which may be some day used as the means of destroying, not only a part of the bill of rights, but the whole of it. Today the whole people of this country are alarmed over the action of a certain court, who, under the plea of "necessity" have written by judicial construction one word into a congressional statute, which the lawmaking power for years refused to write therein.

All that we ask of this court is to construe the law as it is written

and to safeguard those guarantees to the citizen that have been placed in the Constitution of this State by the people of Texas.

There is no necessity of this court confusing the rule as to dying declarations with that of the reproduction of testimony. Dying declarations are admitted by the common law and expressly by the statutes of Texas (art. 788, Code Crim. Proc.), as original testimony and no such rule applies to the reproduction of testimony. In passing, we call the court's attention to the fact, that some of the cases referred to by Judge Harper, in support of his opinion, have been directly overruled by the courts of the State delivering them, notably Missouri. We respectfully refer this court to the cases of Cline and Kemper as the most able opinions ever written upon the subject of reproduction of testimony.